UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

ABDELRAHMAN ABOUELMAGD,

               Petitioner,

-against-

TETIANA SEMENIUK,

               Respondent.

-------------------------------------------------------------------x

**MEMORANDUM AND ORDER**

25-CV-04402 (OEM) (RML)

ORELIA E. MERCHANT, United States District Judge:

*Pro se* petitioner Amr Abdelrahman Abouelmagd ("Petitioner"), a citizen of Egypt, petitions this Court for the return of his three children, Y.A., M.A., and A.A. (the "Children"), to Canada pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670 (the "Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* ("ICARA"). Verified Petition for Return of the Children to Canada, Dkt. 1 (the "Petition" or "Pet."). Petitioner asserts that the Children have been wrongfully retained in the United States by their mother, *pro se* respondent Tetiana Semeniuk ("Respondent"), a citizen of Ukraine, who currently resides in New York.

On August 7, 2025, the Petition was filed, *see* Pet., and on August 12, 2025, the Court directed the Petitioner to file confirmation of service of the Petition on Respondent. On August 28, 2025, the Court issued an Order to Show Cause and Temporary Restraining Order ("TRO"), Dkt. 7, prohibiting Respondent from removing the Children from the State of New York, requiring Respondent to deposit the Children's passports and travel documents with the Court by September 3, 2025, and directing the Respondent to appear and show cause why the Court should not grant the relief requested in the Petition at a hearing on September 3, 2025. The Court further directed Petitioner to serve Respondent with the Petition and accompanying papers. *Id.* On September 2,

2025, Petitioner filed an affidavit of non-service of the Court's Order to Show Cause at Respondent's last known address. *See* Affidavit of Due-Diligence, Dkt. 10. On September 3, 2025, Petitioner appeared virtually, and Respondent did not appear.

On September 5, 2025, the Court ordered that Respondent show cause why she had failed to answer or comply with the Court's September 3, 2025 Order, appear at a hearing on September 15, 2025, and deposit the Children's travel documents with the Court by September 15, 2025. *See* Order, Dkt. 13. The Court further directed Petitioner and the Clerk of Court to serve copies of the summons and Petition, the August 28, 2025 Order to Show Cause, and the September 5, 2025 Order to Show Cause on Respondent at her last known address and on attorneys representing Respondent and Children in separate, state family court proceedings. *Id.* The Court also granted Petitioner's request that the U.S. Customs Service be notified that Respondent should not be allowed to remove the Children from the United States and ordered the U.S. Marshals to so notify the U.S. Customs Service. *Id.* at 1.

On September 10, 2025, Respondent deposited the Children's passports with the Clerk of Court.

On September 15, 2025, the parties appeared at the show cause hearing, and on consent of the parties, the TRO was converted into a preliminary injunction. The parties also agreed to the Court's exercise of its discretion to render its decision based on the parties' written submissions. *Id.* Respondent explained that she was not served with the Petition until her state court attorney was notified because she has been living with the Children at an address kept confidential from Petitioner due to her protection order against Petitioner. *See* Letter from Respondent to the Court (Sept. 12, 2025), Dkt. 18. Respondent was directed to file an answer to the Petition by September 30, 2025, which she did. *See* Respondent's Complete Response Bundle (in Opposition to the

Petition for Return of the Minor Children), Dkt. 19 ("Answer"). Petitioner was directed to file a reply, if any, by October 7, 2025, which he did. *See* Affidavit Response, Dkt. 20 ("Reply"). Since that time, the parties have filed multiple supplemental submissions. *See generally* Dkt. 21-31.[1]

On October 22, 2025, the Court held a hearing ("Hearing"). [TRANSCRIPT].[2]

This Memorandum and Order sets forth the Court's findings of fact and conclusions of law. In sum, after careful consideration of the evidence, the parties' submissions,[3] and the applicable law, this Court finds that: (1) the Children are habitual residents of Canada and have been retained in the United States; (2) the retention was in breach of Petitioner's custody rights; and (3) Petitioner was exercising his rights at the time of the retention. The Court further finds that Respondent has failed to prove by a preponderance of the evidence the affirmative defenses that the Children are well settled or that Petitioner consented to the retention. Petitioner has also failed to show by clear and convincing evidence the affirmative defenses that return to Canada will put the Children at grave risk or would be barred by the United States' fundamental principles relating to the protection of human rights and fundamental freedoms. Accordingly, the petition for return of the Children to Canada is granted.

---

[1] On October 28, 2025, Petitioner filed a letter from his Canadian legal counsel stating that, if the Court orders the Children's return, Petitioner has authorized him to travel to New York to take custody of the Children and return them to Petitioner in Comox, British Columbia. *See* Letter from Petitioner (Oct. 27, 2025) and from Petitioner's Canadian legal counsel to Court (Oct. 24, 2025) at 2, Dkt. 30.

[2] The official transcript of the Hearing is not yet available. This Memorandum and Order relies on the unofficial transcript. Citations to the transcript shall be replaced after the official transcript has been filed.

[3] *See* Pet.; Letter from Petitioner to Court and Exhibits (Aug. 31, 2025), Dkt. 8 to 8-2; Notice to Appear (in Person), Dkt. 12; Letter from Anne M. Serby, Respondent's State Court Counsel and from Respondent to Court and Exhibits (Sept. 9, 2025), Dkt. 14 to 14-1; Answer; Reply; Respondent's Declaration in Opposition to Petitioner's Affidavit, Dkt. 21; Response to Respondent's Affidavit of Response, Dkt. 22; Respondent's Response to Petitioner's Letter (Dated October 7, 2025), Dkt. 23; Petitioner's Statement in Support of Expedited Hearing and to Deny Duplicative Submissions, Dkt. 24; Respondent's Short Response and Request for Immediate Denial, Dkt. 25; Urgent Letter to Judge Orelia Merchant, Dkt. 27 to 27-1; Letter from Petitioner to Court (Oct. 21, 2025), Dkt. 28; Respondent's Supplemental Memorandum of Law in Opposition to Hague Petition and In Support of Enforcement of Family Court Order of Protection, Dkt. 29; Letter from Petitioner (Oct. 27, 2025) and from Petitioner's Canadian legal counsel to Court (Oct. 24, 2025), Dkt. 30; Respondent's Memorandum of Law and Facts, Dkt. 31. All page citations correspond to the ECF PageID pagination.

# FINDINGS OF FACT[4]

## A. 2016-2021: The Parties' Relationship

Petitioner is a citizen of Egypt, and Respondent is a citizen of Ukraine. In 2016, Respondent traveled to Egypt, where she met Petitioner. Pet. ¶ 10. At the time, Petitioner lived in Egypt and Respondent lived in Ukraine. *Id.* Prior to her relationship with Petitioner, Respondent gave birth to a daughter, A.S. *Id.* ¶ 13, n.2. The parties married on November 15, 2017, in Ukraine. *Id.* ¶ 10. After the wedding, the parties continued to live in Egypt and Ukraine, respectively. *Id.* ¶ 12. In May 2018, Petitioner moved to Dubai for a new job. *Id.* ¶ 13. Respondent moved to Dubai in June 2018, with A.S. *Id.* ¶ 13. Respondent gave birth to the parties' first child, Y.A., in the United Arab Emirates on June 21, 2018. *Id.* ¶ 14. In January 2020, the family traveled to New York, where Respondent gave birth to the parties' second child, M.A., on January 24, 2020. *Id.* ¶ 15. The family returned to Dubai after spending three months in New York. *Id.* The Children (Y.S., M.A., and A.A.) are citizens of Ukraine. Answer, Exhibit N at 165-69. Other than the foregoing stay in New York for M.A.'s birth, the parties and the Children have never lived in New York before August 2024. Pet. ¶ 82.

In 2021, the parties decided to move the family to Canada. Pet. ¶ 16; [TRANSCRIPT].

---

[4] Article 11 of the Hague Convention requires courts to "act expeditiously in proceedings for return of children." Neither discovery nor an evidentiary hearing is required by the Hague Convention, ICARA, or the Due Process Clause of the U.S. Constitution's Fifth Amendment. *See Tereschenko v. Karimi,* 23-CV-2006 (DLC), 2024 WL 195547 at *4 (S.D.N.Y. Jan. 18, 2024) (citing *West v. Dobrev,* 735 F.3d 921, 929 (10th Cir. 2013)). The language of the Convention also authorizes courts to "take notice directly of the law of, and of judicial and administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." Hague Convention art. 14; *see also* 42 U.S.C. § 11605 ("[N]o authentication of such application, petition, document, or information shall be required in order for the application, petition, document, or information to be admissible in court."). Accordingly, given the foregoing authority and the *pro se* status of the parties, the Court resolves the instant case based on a review of the parties' submissions, evidence, and arguments presented. Unless otherwise indicated, the parties have established the following facts by a preponderance of the evidence.

**B. 2022-2024: Life in Canada**

Respondent moved to Canada in August 2022, with A.S., Y.A., and M.A., while Petitioner stayed in Dubai to obtain a Canadian work visa.  Pet. ¶ 17; [TRANSCRIPT].  Respondent, A.S., Y.A., and M.A. received Canadian-Ukrainian Authorization for Emergency Travel ("CUAET") visas, which permitted Ukrainian citizens to reside in Canada for three years.  Pet. ¶ 16; *see also* Answer, Exhibit N at 165, 167-68.  Respondent gave birth to A.A. while in Canada on January 29, 2023.  Pet. ¶ 18.  Petitioner relocated to Canada on May 13, 2023.  *Id.* ¶ 19.  On August 1, 2023, the parties jointly signed a month-to-month lease at 2222 Urquhart Ave., Courtenay, British Columbia.  *Id.* ¶ 24, Exhibit G.   The elder of the Children, Y.A. and M.A., were enrolled in school full time while in Canada.[5]  Pet. ¶ 22.  The Children are all under the age of sixteen.  *Id.* ¶ 85.

The parties' relationship began to deteriorate in late 2023.  *Id.* ¶ 25.  Police records indicate that the police were called on September 7, 2023, and September 9, 2023, after an argument between Petitioner and Respondent.  Respondent's Declaration in Opposition to Petitioner's Affidavit, Exhibit B at 6-10, Dkt. 21.  The report was coded as "likelihood of physical harm."  *Id.* at 6.  On December 29, 2023, Respondent called the Royal Canadian Mounted Police ("RCMP") alleging that Petitioner was hitting her.  Pet. ¶ 25; Answer, Exhibit B at 34.  According to the RCMP report from this incident, Respondent reportedly called the police after Petitioner hit her arm, but Petitioner was not arrested because Respondent chose not to press charges.  Answer, Exhibit B at 29, 34-35.

Petitioner alleges that Respondent physically abused Y.A., and in May 2024, Y.A. informed a teacher that his mother was pulling his ears and causing him pain.  Pet. ¶ 27; *see also id.*, Exhibit

---

[5] At the Hearing, Respondent asserted that the Children were exposed to "LGBT propaganda" at their public schools in Canada, which is not accepted in the Children's Muslim faith.  [TRANSCRIPT].  Petitioner denied these allegations. [TRANSCRIPT].  As further set forth *infra*, the Court accords little weight to the argument.

H at 74. After consultation with a social worker with the Ministry of Children and Family Development about this allegation, the parties signed a safety plan. Pet. ¶ 27.

Petitioner further alleges that he found Y.A. "hog-tied on his bed at home" upon arriving home from work one day in June 2024 and once more on July 20, 2024. *Id.* ¶¶ 28-29. Following the alleged July 20, 2024, incident, Petitioner called the Ministry of Children and Family Development to the family home. *Id.* ¶ 30. Respondent was ordered to reside elsewhere for three nights while Petitioner stayed with the children. *Id.* ¶ 37; *id.*, Exhibit H at 71.

On July 22, 2024, the RCMP documented that they planned to contact Petitioner to advise him that a criminal investigation was proceeding as to the allegation that Respondent hog-tied Y.A. Pet., Exhibit H at 73. During RCMP's investigation, Respondent reportedly "admitted to tying [Y.A.] up previously four times, but it was because he had already done that to himself first. [A.S.] the 13 year old biological daughter of [Respondent] advised that [Y.A.] hits her all of the time, and his hands are tied to stop him from hitting." *Id*.

On July 22, 2024, the RCMP reported that Respondent texted A.S. to pack their bags because they were leaving the country. *Id.* at 74, 76. On July 23, 2024, the RCMP recorded that

> [I]t was very concerning that [Respondent] had communicated with her daughter, [A.S.] and advised her to pack their belongings as they may be leaving the country. [Police officer] updated [social worker] that [Respondent] is in possession of their passports and documentation, and has access to monies and credit cards. At this time, [social worker] is advised that they have been cautioned by another agency not to undermine [Respondent's] intelligence and ability to formulate and execute plans that could include something like removing the children from Canada.

*Id*. at 79.

Upon Respondent's return to the family residence on July 25, 2024, she insisted that the family leave Canada to the United States to renew the Children's Ukrainian passports. Pet. ¶ 45. According to Respondent, the timing of the family's travel to the United States was based on the family "receiv[ing] a letter from Immigration, Refugees and Citizenship Canada indicating that

[their] temporary status was concluding and [they] were expected to leave the country." Answer, Affidavit of Tetiana Semeniuk ¶ 2 ("Resp.'s Aff."). Additionally, Respondent claims the family's Ukrainian passports were expiring "and could not be renewed in Canada" due to a two year wait at the Canadian consulate. *Id.* Respondent submitted exhibits of Y.A.'s and M.A's expiring CUAET visas. *See, e.g.*, Answer, Exhibit N at 165 (Child M.A.'s CUAET visa states, "MUST LEAVE CANADA BY 2024/08/31."). She contends that the family moved to the United States to "resolve this urgent immigration and documentation crisis," and "Petitioner . . . was fully aware of these pressures." *See, e.g.*, Resp.'s Aff. ¶¶ 2-5; Respondent's Declaration in Opposition to Petitioner's Affidavit, Dkt. 21 ¶ 10. According to Petitioner, he "felt he had no viable alternative but to comply" and left Canada with the family on July 28, 2024. Pet. ¶ 46. Petitioner anticipated that the passport renewal processing times could take weeks to months, and not knowing how long the embassy wait time would be, he purchased one-way tickets for the family. [TRANSCRIPT].

### C. 2024-2025: Travel to the United States and Subsequent Legal Proceedings

The family flew to Seattle on July 28, 2024. Pet. ¶ 46. After finding that the embassy wait-time in Seattle was also too long, the family then traveled to New York on August 3, 2024. *Id.*; [TRANSCRIPT]. The family stayed in temporary housing provided by one of Respondent's contacts as it was a less expensive option. [TRANSCRIPT]. Petitioner believed that the family's trip to the United States would last no longer than two-to-three months, depending on embassy wait time, [TRANSCRIPT], and that they would return to Canada after they obtained their passports, Pet. ¶ 46; [TRANSCRIPT]. According to Petitioner, he "never consented for the [Children] to remain in the United States." Affidavit Response ¶ 10, Dkt. 20; [TRANSCRIPT].

On July 29, 2024, the family's social worker reported receiving a text from Petitioner stating that they had left the country. Pet., Exhibit H at 81. The text said that Petitioner had gone

to Egypt with Y.A. and Respondent had gone to Europe with the children. *Id.* When the social worker visited the family's residence, it looked as though they'd "up and left from the outside looking in," and she "did not anticipate the family returning." *Id.* One of the family's contacts with the Ukrainian Society similarly advised the RCMP that Respondent said that she, A.S., M.A., and A.A. were in Germany with friends who had paid for their flights and that they would be staying until A.S. and M.A.'s passports could be renewed. *Id.* at 85. Meanwhile, Respondent told the contact that Petitioner and Y.A. were in Egypt so that Petitioner could assist with a family matter. *Id.*

Only after the family had arrived in New York, "Respondent insisted that the family make an application for refugee status and remain in New York," Pet. ¶ 47; [TRANSCRIPT]. Petitioner did not agree because he would then be unable to travel back to Egypt to see his family. Pet. ¶ 47. He did not want to live in the United States; rather the family's life was in Canada. *Id.* Petitioner called NYPD on August 4, 2024, "due to Respondent's past threats to take the children away and not return them." [6] *Id.* ¶ 49.

On August 6, 2024, Petitioner called New York Child Protective Services ("CPS") alleging Respondent was abusing the Children. *Id.* ¶ 55.

On August 9, 2024, Petitioner contacted the RCMP stating that Respondent sent false information from his phone indicating that he had taken Y.A. to Egypt, while Respondent had taken the other three children to Germany. *Id.* ¶ 54. Further, Petitioner stated that Respondent "has been

---

[6] At the Hearing, Petitioner stated that on or about August 4, 2024, Respondent said she was going to stay in the United States with the Children and that she was going to force him to stay illegally in the United States, which he relayed to the NYPD. [TRANSCRIPT]. The Court notes, however, that the events that Petitioner recollected at the Hearing are more consistent with the record of events that occurred on August 9, 2024, with Petitioner's text message to RCMP that Petitioner was threatening to take the Children and was forcing him to stay in the United States.

threatening [him] that she will take the kids and [he] will never see them again[.] [S]he has all passports . . . and she is forcing me to stay here illegally . . . ."  *Id.* (quoting Exhibit H at 86).

On August 11, 2024, Petitioner again called CPS alleging that Respondent was abusing the Children.  *Id.* ¶ 55.  Respondent produced a New York Office of Children and Family Services report finding that Petitioner's calls to CPS alleging inadequate guardianship and excessive corporeal punishment of Y.A. were "unsubstantiated."  Answer, Exhibit A at 18.

Petitioner returned to Canada on August 12, 2024, due to concerns of his Canadian visa expiring and upon the belief that "he could not take the Children back to Canada as Respondent kept the Children's passports in her possession and refused Petitioner access to them."  Pet. ¶ 56; *id.*, Exhibit H at 95; [TRANSCRIPT].

Petitioner contends that the Children's habitual residence is Canada.  Pet. ¶ 64.  The RCMP police records stating that the family would not return, are primarily based on text messages allegedly sent by Respondent from Petitioner's phone.[7]  The messages are demonstrably false given that the family was undisputedly in the United States together. *Id.*, *see also* Exhibit H at 83 ("[R]eceived information from CBSA today, that indicates that the entire . . . family left Vancouver International Airport (YVR) on July 28, 2024 on the 9:15 pm flight to Seattle (SEA).").  In fact, when Petitioner initially returned from New York, he lived in the family's shared residence at 2222 Urquhart Ave., Pet. ¶ 57, and later moved to a smaller residence to maintain his financial support of Respondent and the Children, [TRANSCRIPT].

---

[7] In addition to the foregoing communications from Respondent to the family's contact with the Ukrainian Society, Pet., Exhibit H at 82, *see id.* at 69  ("[Petitioner"] left the country with ["Y.A."] and [Respondent] and the rest of the children are now in Germany waiting to renew the children's passports. Family will not be back to Canada and if they do it will not be to Comox Valley."); *id.* at 71 ("Petitioner texted [Canadian social worker] that the family has left the country and he has gone to Egypt with [Y.A.] [Respondent] has gone to Europe (presumably Ukraine) with the other children.").

Respondent alleges that when Petitioner learned that the salaries were lower in the United States and did not want to apply for asylum, he returned to Canada. Respondent's Letter to the Court and Exhibit at 24, Dkt. 14-1. Respondent also argues that Petitioner left his Canadian job and was searching for a new job in New York, ostensibly on the understanding that the family would remain in New York. Respondent's Supplemental Memorandum of Law in Opposition to Hague Petition and In Support of Enforcement of Family Court Order of Protection, Exhibit H at 22, Dkt. 29; [TRANSCRIPT]. However, the Court is unconvinced by Respondent's claim that Petitioner intended for the Children to remain in the United States because he quit his job and began looking for jobs in New York. Petitioner has credibly explained that he was not able to take time off for such an extended and an indefinite period as the travel to the United States to obtain passport renewal would require. [TRANSCRIPT]. He returned to the same job when he returned to Canada. [TRANSCRIPT].

Petitioner maintains that he has custody rights within the meaning of Articles 3 and 5 of the Hague Convention. Pet. ¶ 68. He states that at the time of the alleged wrongful retention, he had rights of custody under the Canadian Children's Law Reform Act, Canadian Divorce Act, and British Columbia's Family Law Act. *Id.* ¶¶ 71-78. He also states that he was exercising these rights at the time of the alleged wrongful retention. *Id*. ¶ 72. Though Respondent seemingly disputes that Petitioner was exercising these custody rights at the time of alleged wrongful retention, *see* Resp.'s Aff. ¶ 5 ("[Petitioner] voluntarily abandoned our family on August 12, 2024, stating unequivocally he would not return, thereby severing the family's ties to Canada."); *see also* Respondent's Response to Petitioner's Letter (Dated October 7, 2025) at 11, Dkt. 23 (CPS report stating Petitioner has refused to pay for the Children's needs), at the Hearing, Respondent did not deny that Petitioner has custody rights, [TRANSCRIPT].

After remaining in New York, Respondent subsequently applied for asylum for herself, A.S., Y.A., and A.A., and pending the determination, acquired work authorization and employment authorization documents from the United States government, as well as A-Numbers and Social Security Numbers for herself, Y.A., and A.A.  *See* Answer at 2, Exhibit H at 96; Resp.'s Aff. ¶ 4; Urgent Letter to Judge Orelia Merchant at 3, Dkt. 27; Respondent's Supplemental Memorandum of Law in Opposition to Hague Petition and In Support of Enforcement of Family Court Order of Protection at 26, Dkt. 29.  Respondent asserts that the Children have been well-settled in New York for nearly one and a half years.  Urgent Letter to Judge Orelia Merchant at 3, Dkt. 27.  Respondent has enrolled the Children in school, activities, and medical care.  *See generally* Resp.'s Aff. ¶ 6 ("The children are now thriving in New York . . . enrolled in private Muslim schools consistent with our family's principles, and [A.A.] will soon begin a 3K program."); Answer, Exhibit F (providing the Children's school enrollment records); *id.*, Exhibit H (attaching the Children's medical insurance records).

Respondent argues that returning the Children would expose them to a "grave risk of physical or psychological harm" due to Petitioner's "clear pattern of domestic violence and abandonment."  Answer at 1.  On August 21, 2024, Respondent obtained a Temporary Order of Protection ("Protective Order") from New York State Family Court in Queens County ("Family Court") ordering Petitioner to "stay away" from Respondent and the Children.  Answer, Exhibit C at 56-59.  Respondent submits a CPS report dated August 18, 2024, that states

> Child(ren) has experienced or is likely to experience physical or psychological harm as a result of domestic violence in the household. Comment: The father is trying to manipulate the mother by calling the police and forcing her give him the passports for the kids. The father is also refusing to help provide for the children immediate needs, though the mother suspect that he has financial means. Mother revealed history of physical violence perpetrated by the father and currently it appears that he is demonstrating controlling behaviors.

Answer, Exhibit A at 14-15. The report does not clarify how or why the Children were likely to experience physical or psychological harm as a result of household domestic violence. It attaches no further documentation of interviews with the Children, Respondent, or Petitioner, or other evidence in support.

Respondent submits testimony from her daughter, A.S., in Family Court stating that Petitioner hit Y.A. and M.A. "on the face, legs and hands . . . very often." Answer, Exhibit K at 148. Respondent also alleges that Petitioner admitted to hitting Y.A., citing a January 22, 2023, WhatsApp message from Petitioner stating, "Did I hit [Y.A.] many times for [M.A.] . . . yes and if [Y.A.] is younger I will do [] the same." Answer, Exhibit E at 83; *see also id.* at 84 ("if another person will kill you or kill himself or kids."). As the screenshots are isolated, the context of Petitioner's messages is unclear, and it is also unclear whether his messages were translated. In any event, the parties raised no additional evidence of each other's alleged harm of the Children at the Hearing and agreed that the record was complete regarding such allegations. [TRANSCRIPT].

On September 3, 2024, Respondent filed for a divorce from Petitioner in a Ukrainian court, which granted the divorce effective November 12, 2024. Answer, Exhibit M at 160. The divorce order made no determination as to the custody of the Children, despite Respondent's request that she be granted custody. *Id.* at 159 ("For the above reasons, the court concludes that the plaintiff's claim to determine the place of residence of the minor children with their mother shall be rejected.").

On October 1, 2024, Petitioner consulted the RCMP about the fact that he could no longer see or communicate with his children, but he was advised that there was nothing the RCMP could do to assist him. Pet., Exhibit H at 95. [8]

---

[8] Respondent's Family Court Protective Order has been renewed effective through February 6, 2026. Respondent's Declaration in Opposition to Petitioner's Affidavit at 4, Dkt. 21. Per the protective order, Petitioner must refrain from

On November 4, 2024, Petitioner filed a Hague Convention Application with the Central Authority in British Columbia, Canada. Pet. ¶ 61, Exhibit L.

Petitioner transferred money to Respondent after he left New York and prior to the Family Court Protective Order. Affidavit Response at 7-10, Dkt. 20 (attaching transaction history showing $19,400 CAD transferred to Respondent between September 6, 2024, and January 27, 2025). Petitioner has been paying child support in compliance with the Family Court's June 16, 2025, order directing Petitioner to pay Respondent $600 USD twice a month, commencing on June 30, 2025 (the "Child Support Order"). Response to Respondent's Affidavit of Response at 5-6, Dkt. 22; Petitioner's Statement in Support of Expedited Hearing and to Deny Duplicative Submissions at 2, Dkt. 24 (attaching a screenshot of Petitioner's "recent activity" of payments of $600 USD semi-monthly to "New York State Child Support" June 30, 2025, through September 28, 2025). Respondent does not deny Petitioner's financial support. [TRANSCRIPT]. Respondent even argued at the Hearing that she has no need for Petitioner's child support and is able to adequately provide for the Children on her salary. [TRANSCRIPT]. The Court acknowledges the foregoing as well as Respondent's contention that she covers all expenses for the Children on her own, aside from Petitioner's bi-monthly child support, $1,000 of which is deducted for medical benefits. Respondent's Response to Petitioner's Letter (Dated October 7, 2025) at 2, Dkt. 23.

Petitioner has filed for permanent residency in Canada "as a pathway for citizenship to the entire family." Reply ¶ 5; [TRANSCRIPT]. He also states that he can receive healthcare for the family through his job. [TRANSCRIPT].

---

communication or any other contact with the Children and Respondent except to communicate regarding custody and permitted to have video calls with the Children once a week while supervised by a social worker. *Id.* Respondent recently submitted an email dated October 29, 2025, from her Family Court attorney, who writes that that there is a confidential supervision report by the social worker recommending that the supervised visits be terminated and requesting that this Court issue a subpoena for this record. Respondent's Memorandum of Law and Facts at 7, Dkt. 31.

## CONCLUSIONS OF LAW

### A.  The Hague Convention

The Hague Convention was adopted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention at Preamble.  United States district courts have original jurisdiction over actions arising under the Hague Convention.  *See* 22 U.S.C. § 9003(a).

The Hague Convention "seeks 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State,' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" *Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (quoting Hague Convention art. 1).  The United States has implemented the Hague Convention through ICARA.  *Id.* at 9; *see also* 22 U.S.C. §§ 9001 *et seq.*

The remedy under the Hague Convention is the return of the child to their country of habitual residence. *Abbott*, 560 U.S. at 9.  When a child younger than sixteen "has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Id.* (citing Hague Convention arts. 4, 12).  A removal is wrongful where

> a) it is in breach of rights or custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention art. 3.

To establish a *prima facie* case of wrongful removal or retention under the Hague Convention, a petitioner must establish by a preponderance of the evidence that

14

> (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of removal or retention.

*Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005); *see also* 22 U.S.C. § 9003(e)(1).

If a petitioner establishes a *prima facie* case of wrongful removal or retention, the child must be returned to the place of habitual residence unless one of the affirmative defenses set forth in the Hague Convention applies. *See Mota v. Castillo,* 692 F.3d 108, 113 (2d Cir. 2012). A respondent opposing the return of the child has the burden of establishing, by clear and convincing evidence, that one of the exceptions set forth in Article 13(b) or Article 20 of the Hague Convention applies or, by a preponderance of the evidence, that any other exception set forth in Article 12 or Article 13 of the Hague Convention applies. 22 U.S.C. § 9003(e)(2); *see also Blondin v. DuBois (Blondin II),* 189 F.3d 240, 245 (2d Cir. 1999). Importantly, a court's consideration of a Hague Convention petition may not consider the merits of any underlying custody disputes*, see* Hague Convention art. 16; "[r]ather, **the Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings**," *Mota,* 692 F.3d at 112 (emphasis added).

The Court first considers whether Petitioner has established a *prima facie* case of wrongful retention by a preponderance of the evidence.[9] The Court then considers whether Respondent has met her burden in establishing any one of the affirmative defenses set forth in the Hague Convention.

---

[9] Because the Petition focuses on wrongful retention, rather than wrongful removal, the Court assesses the merits based on wrongful retention. Further, by all accounts, Petitioner willingly left with Respondent and the Children to Seattle, then New York, which aligns with retention, not removal. "'[W]rongful retention' occurs when one parent, having taken the child to a different Contracting State with permission of the other parent, fails to return the child to the first Contracting State when required." *Marks ex rel. v. Hochhauser,* 876 F.3d 416, 421 (2d Cir. 2017) (citing *Taveras v. Morales,* 22 F. Supp. 3d 219, 231-32 (S.D.N.Y. 2014)).

### B. Petitioner's *Prima Facie* Case

#### 1. Habitual Residence

Petitioner must first demonstrate that Canada was the Children's habitual residence. *See Gitter*, 396 F.3d at 130-31. Habitual residence is undefined by the Hague Convention, but the Second Circuit recommends a two-step analysis.

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Id.* at 133-34. Put a different way, courts consider factors such as "where a child has lived, the length of time there, acclimatization, and the 'purposes and intentions of the parents.'" *See Grano v. Martin*, 821 F. App'x 26, 27 (2d Cir. 2020) (citing *Monasky v. Taglieri*, 589 U.S. 68, 79 (2020)).

#### a. Shared Intent

The Second Circuit has previously considered whether shared intent exists based on whether the parents mutually or conditionally purchased one-way tickets, retained bank accounts in the former country, enrolled the child in school, bought a house together, or registered the child as a citizen with the new country's consulate and as a resident of a town in the new country. *Compare Grano*, 821 F. App'x at 28 (inferring the parties' shared intent to move their family to Spain based on evidence that the parties sent nearly all of child's belongings to Spain, bought one-way tickets, purchased property in Spain, and registered the child as a Spanish citizen)*, with Gitter*, 396 F.3d at 135 (determining that the parties only mutually agreed to move to Israel on a conditional basis because while the father closed bank accounts, sold property in the United States, and bought property in Israel, he simultaneously told the mother that they could move back after

16

a trial period in Israel).  The relevant period of habitual residence is the span of time immediately before the date of the alleged wrongful retention.  *Monasky*, 589 U.S. at 77.

Beginning in 2022, the parties intended the Children's habitual residence to be in Canada. Respondent moved from Dubai to Canada with the Children, she applied for their Canadian visas, A.A. was born in Canada, and Petitioner later joined them.  Thus, the focus of the Court's inquiry is whether there is evidence that the parties mutually intended for the Children's residence to be the United States and not Canada during the period immediately prior to late July 2024, when the family traveled to the United States.

Petitioner, alleges that the Children's habitual residence is Canada.  Respondent, on the other hand, contends that in July 2024, the parties mutually intended for the Children to acquire a new habitual residence in the United States because he was aware of the urgency of the Children's expiring visas.  Petitioner's awareness of the Children's expiring visas is not evidence of his agreement to change the Children's habitual residence.  While it may evidence Respondent's motives to move to the United States with the Children, it fails to establish the parties' shared intent.  The evidence shows that in late July, 2024, it was only Respondent's unilateral and future intent for the Children to reside in the United States.  Furthermore, there is no evidence that the parties mutually enrolled the Children in school in the United States, secured a permanent residence in New York, or registered the Children as citizens or residents in the United States, aside from M.A., who was born in the United States.

Petitioner traveled to the United States with the family upon the belief that they would return after receiving the updated travel documents, not that the Children would thereafter reside in the United States.  Even if Petitioner mutually agreed for them to stay in the United States to do so, it was a temporary and conditional agreement, not indefinite.  The parties initially traveled to

17

Seattle to update the documents and, only after learning that the embassy wait was too long, did they make plans to travel to New York.  One day after arriving in New York, Petitioner began making calls to NYPD, Child Protective Services, and RCMP expressing his concern that Respondent was going to take the Children and deny him access to their travel documents for their travel back to Canada, which demonstrates his lack of intent to remain and lack of consent to the Children's retention in the United States.  Petitioner's return to Canada without the Children further evidences a lack of shared intent.  *See, e.g., Mota*, 692 F.3d at 115 ("[I]f the parents did not agree that [the child] would live indefinitely in America regardless of her mother's presence, it cannot be said the parents 'shared an intent' in April 2010 that America would be [the child's] state of habitual residence.").  Given the foregoing, the Court finds that the parties' last shared intent for the Children's habitual residence was Canada and not the United States.

### b.  Acclimatization

The Court must next consider whether the evidence "unequivocally points to the conclusion" that the Children were acclimatized in New York and that their "habitual residence has consequently shifted."  *See Gitter,* 396 F.3d at 133-34.

In rare circumstances, a child may acclimatize to new surroundings such that their habitual residence has shifted.  Requiring return to the original country would therefore be tantamount to "taking the child 'out of the family and social environment in which its life has developed.'" *Gitter*, 396 F.3d at 134 (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1081 (9th Cir. 2001)); *see Hofmann v. Sender*, 716 F.3d 282, 292 (2d Cir. 2013).  The Second Circuit has, however, cautioned that "courts should be 'slow to infer' that the child's acclimatization trumps the parents' shared intent." *Gitter*, 396 F.3d at 134 (quoting *Mozes*, 239 F.3d at 1079).  "A finding that this standard is satisfied is therefore only appropriate 'in "relatively rare circumstances" in which a child's

degree of acclimatization is "so complete that serious harm . . . can be expected to result from compelling his or her return to the family's intended residence."'" *Hofmann,* 716 F.3d at 294 (quoting *Mota*, 692 F.3d at 116).  "When applying this framework, the age of the child and the time spent in the respective countries can affect how much weight a court should place on parental intent." *Guzzo v. Cristofano*, 719 F.3d 100, 108 (2d Cir. 2013).

Respondent argues that the Children have fully acclimatized because they have been present and residing in New York for a little over a year.  The Court does not find that a little over a year is so significant a time period that the Court ought to conclude the Children's habitual residence to be New York despite the Court's finding that the parties' last shared intent was that the Children reside in Canada.  *See Mota,* 692 F.3d at 116 (concluding that two years residing in New York is not "nearly so great that we could presume that returning her to Mexico would expose her to the 'severe harm' one associates with child's 'deprivation of [her] acclimatized life'" (alteration in original) (quoting *Gitter*, 396 F.3d at 134)).

Further, as some sister courts have noted, just as the shared intent of the parties prior to the allegedly wrongful retention is most relevant for the Court's consideration, so is the Children's acclimatization prior to the allegedly wrongful retention.  *See Morales v. Restrepo*, 24-CV-07951 (NCM) (TAM), 2025 WL 939294, at *8 (E.D.N.Y. March 28, 2025) (considering only the child's four-month tenure in the United States prior to the date of alleged wrongful retention); *Ordonez v. Tacuri,* 09-CV-1571 (FB), 2009 WL 2928903, at *6, n.8 (E.D.N.Y. Sept. 10, 2009) ("The Court is mindful that it would be inappropriate to consider the period of time *after* the alleged wrongful removal in the acclimatization analysis, as this could 'reward the [allegedly] abducting parent for the time during which the child was [allegedly] wrongfully retained or removed."); *Tatari v. Durust*, 24-CV-6930 (CBA) (SJB), 2024 WL 4956307, at *5 (E.D.N.Y. Dec. 3, 2024) (holding

that, despite evidence that the child may have become acclimatized to the United States in the three months since a move from Turkey, the child lived in Turkey until he was brought to the United States, so Turkey was his habitual residence).

Respondent states that, since moving to New York, the Children have been enrolled in school, activities, and medical care. Nonetheless, the family had not lived in, and Respondent provides no evidence that the Children were acclimatized to living in, the United States prior to the alleged wrongful retention in August 2024. The Children lived in Canada immediately prior to their retention in New York. Before the alleged wrongful retention, they had not lived in or acclimatized to New York to such an extent that removal would be "tantamount to" taking them out of the environment in which their life has developed. *See Gitter*, 396 F.3d at 134. There may be evidence that they have established such an environment *since* their retention, but the Court accords little weight to these facts as doing so would reward Respondent for allegedly wrongful behavior.

Additionally, the Children are of a younger age, now between the ages of seven and two, which courts have acknowledged may be of less weight in contrast to that of older children as it relates to the impact of acclimatization. *See Monasky*, 589 U.S. at 78 ("For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant.").

The Court therefore determines that the Children's acclimatization to New York is not so complete that their habitual residence of Canada has shifted.

**2. Breach of Custody Rights Exercised at Time of Retention**

The Court next considers whether Petitioner has established the second and third elements of a *prima facie* case under the Hague Convention. Petitioner must demonstrate that the Children's

retention in the United States in August 2024 was in breach of Petitioner's custody rights under Canadian and, more specifically, British Columbian, law.  Article 14 of the Hague Convention permits the Court to take judicial notice of the law of the state of habitual residence in determining whether a retention was wrongful under Article 3.

The Hague Convention provides that rights of custody may be determined by operation of law.  Hague Convention art. 3.

Respondent does not dispute that Petitioner has custody rights. Although the parties have been granted a divorce by a Ukrainian court, that court declined to make a custody determination. Further, to the extent that Respondent avers that Petitioner refused to pay for the Children's needs, that claim is wholly unsubstantiated by the record of Petitioner's transactions to Respondent from September 2024 to January 2025 and after the Family Court's Child Support Order entered in June 2025.  It further conflicts with Respondent's own testimony at the Hearing, where she acknowledged Petitioner's payments.  Respondent's claim of lack of financial support is thus insufficient to challenge Petitioner's  custody rights.  *See Baxter v. Baxter*, 423 F.3d 363, 369 (3d Cir. 2005) (finding a lack of financial support over a short period of just a few weeks to be insufficient).

The applicable British Columbian authority states that parental responsibilities with respect to a child include, *inter alia*, making day-to-day decisions affecting the child; having day-to-day care, control, and supervision of the child; making decisions as to where the child will reside; making decisions as to the child's education and participating in extracurricular activities; starting, defending, compromising, or settling any proceeding relating to the child; and exercising any other responsibilities reasonably necessary to nurture the child's development.  *See* Family Law Act, S.B.C. 2011, c. 25, § 41 (Can.).

Petitioner has met his burden in showing that he has custody rights over the Children pursuant to Canadian law.  *See* Family Law Act, S.B.C. 2011, c. 25, § 41 (Can.); *see also* Children's Law Reform Act, R.S.O. 1990, c. C.12, § 20(1) (Can.); Family Law Act, R.S.O. 1990, c. F.3, § 31(1) (Can.).  Additionally, there is clear evidence of Petitioner's financial support of the Children.  "But for" Respondent's retention of the Children in New York, Petitioner would still be exercising his custody rights as to the Children.  *See* Hague Convention art. 3; *Mota* 692 F.3d at 117.

Article 5(a) of the Hague Convention also provides that the "rights of custody shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  By retaining the Children in New York and refusing to return them to Canada, Respondent breached Petitioner's rights of custody, including his right to determine the Children's place of residence, under British Columbian law.  Thus, Petitioner has met the second and third prongs of a *prima facie* case under the Hague Convention.

For these reasons, Petitioner has established a *prima facie* case of wrongful retention under the Hague Convention and ICARA, and ICARA requires that the Children be repatriated for custody proceedings unless Respondent establishes any one of five affirmative defenses.  42 U.S.C. §§ 11601(a)(4), 11603(e)(2); *Souratgar v. Lee*, 720 F.3d 96, 101-02 (2d Cir. 2013).

## C.  Affirmative Defenses

Given that  Petitioner has made out a *prima facie* case for return of the Children, the Court now considers whether Respondent has met her burden in establishing any of the affirmative defenses available under the Hague Convention.  There are five exceptions to the requirement that a child be returned to the country of habitual residence despite wrongful retention.  *See Ermini v. Vittori,* 758 F.3d 153, 161 (2d Cir. 2014).  Respondent raises three of them: the "grave risk defense,"

"well-settled defense," and the "violation of human rights and fundamental freedoms defense." In light of Respondent's *pro se* status, the Court further considers whether there is sufficient evidence as to the remaining relevant affirmative defense of consent and acquiescence, regardless of whether Respondent has expressly raised it.[10]

First, the "grave risk" affirmative defense excepts return if there is clear and convincing evidence that return would place the Children "at a 'grave risk' of harm or otherwise in 'an intolerable situation.'" *See Monasky*, 589 U.S. at 72 (quoting Hague Convention art. 13(b)); 42 U.S.C. § 11603(e)(2)(A). Second, the "well-settled" defense applies if more than one year has passed before proceedings have commenced and Respondent demonstrates that the Children are now settled in their new environment by a preponderance of the evidence. *See Lozano v. Alvarez*, 697 F.3d 41, 51-52 (2d Cir. 2012); Hague Convention, art. 12; 42 U.S.C. § 11603(e)(2)(B). Third, under Article 20 of the Hague Convention, Respondent must show by clear and convincing evidence that the return of the Children "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention art. 20; 42 U.S.C. § 11603(e)(2)(A). Fourth, the "consent or acquiescence" defense applies if Respondent shows by a preponderance of the evidence that the Petitioner "was not actually exercising the custody rights at the time of removal or retention or had consented to or subsequently acquiesced in the removal or retention." Hague Convention art. 13(a); 42 U.S.C. § 11603(e)(2)(B). Finally, even if Respondent establishes any of the foregoing affirmative defenses,

---

[10] "Article 13 also permits a court to refuse the order of return where the child objects to being returned and has achieved an age and degree of maturity at which it is appropriate to consider her views." *Broca v. Giron*, 11-CV-5818 (SJ) (JMA), 2013 WL 867276, at *9 (E.D.N.Y. March 7, 2013) (citing Hague Convention art. 13); *see also* ELISA PÉREZ-VERA, EXPLANATORY REPORT ¶ 30 (1981) ("It seemed best to leave the application of this clause to the discretion of the competent authorities.") (the "Pérez-Vera Report"); *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16-17 (2014). The Court thus determines that the additional "age and maturity" defense under Article 13 is inapplicable here as the Children are no older than seven, and Respondent has not set forth evidence that the Children are old or mature enough to express their objection to returning to Canada, independent from the influence of their mother.

the Court retains discretion to order the Children's return and is not bound to permit the Children to remain with Respondent.  *See Souratgar*, 720 F.3d at 103 (citing *Blondin II*, 189 F.3d at 246 n.4).

### 1.  Grave-Risk Defense

Respondent must show by clear and convincing evidence that the Children would be placed at a grave risk of harm if they were to be returned to Canada for custody proceedings.  Article 13(b) contemplates grave risk of harm from repatriation in two situations: "(1) where returning the child means sending him to 'a zone of war, famine, or disease'; or (2) 'in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.'"  *Blondin v. Dubois (Blondin IV)*, 238 F.3d 153, 162 (2d Cir. 2001) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996)); *see also Friedrich,* 78 F.3d at 1068 ("The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest.  That decision is a custody matter, and reserved to the court in the country of habitual residence.").

Spousal abuse "is only relevant under Article 13(b) if it seriously endangers the child.  The Article 13(b) inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm."  *Souratgar*, 720 F.3d at 103-04.  This exception has been found "where the petitioner showed a 'sustained pattern of physical abuse and/or a propensity for violent abuse' that presented an intolerably grave risk to the child" as could a showing of the child's exposure to such abuse.  *Id.* at 104 (quoting *Laguna v. Avila,* 07-CV-5136 (ENV), 2008 WL 1986253, at *8 (E.D.N.Y. May 7, 2008)).  "Sporadic or isolated incidents of physical discipline directed at the child, or some

limited incidents aimed at persons other than the child, even if witnessed by the child have not been found to constitute a grave risk." *Id.* (citing *In re Filipczak,* 838 F. Supp. 2d 174, 180 (S.D.N.Y. 2011)). Courts have found the grave-risk exception is not met when the petitioner was physically abusive towards the respondent, but there was no clear and convincing evidence that the petitioner posed a grave risk to the child by virtue of efforts to control the respondent parent. *See Grano*, 821 Fed. App'x. at 28-29. "A grave risk of harm occurs where the 'petitioning parent has actually abused, threatened to abuse, or inspired fear in the children in question.'" *Id.* at 27 (quoting *Ermini*, 758 F.3d at 164).

"The grave risk exception is an affirmative defense, and the burden is on the respondent to prove the defense by clear and convincing evidence, though the underlying facts must only be proven by a preponderance of the evidence." *Id.* at 28 (citing 22 U.S.C. § 9003(e)(2)(A)). To "hold evidence of spousal conflict alone, without a clear and convincing showing of grave risk of harm to the child, to be sufficient to decline repatriation, would unduly broaden the Article 13(b) defense and undermine the central premise of the Convention: that wrongfully removed children be repatriated so that questions over their custody can be decided by courts in the country where they habitually reside." *Souratgar,* 720 F.3d at 105-06.

The heart of Respondent's argument is that returning the Children would expose them to a grave risk of physical or psychological harm due to Petitioner's alleged pattern of domestic violence and abandonment. But the record lacks clear and convincing evidence of Petitioner's physical or psychological harm of the Children. Respondent directs the Court to *Blondin IV*, where the Second Circuit found a grave risk of harm threatened the children because they would suffer "a recurrence of acute, severe traumatic stress disorder if they return[ed] to France." 238 F.3d at

158.  Here, however, there is no similar evidence that the Children currently suffer from trauma or will suffer from trauma if returned to Canada.

Respondent offers evidence alleging Petitioner's physical abuse of the Children based on testimony by A.S., Respondent's biological child.  The Court is not persuaded by A.S.'s limited testimony.  The Court further acknowledges that any alleged harm to A.S. shall be recognized as "incidents to a person other than the child" because Petitioner has not petitioned for the return of A.S., and A.S. is not his biological child.

Respondent additionally claims that Petitioner's two WhatsApp messages establish his admission to physical abuse of the Children.  Notwithstanding that subsidiary facts need only be proven by a preponderance of the evidence; this evidence remains insufficient because Respondent's screenshots of the messages lack context, are subject to interpretation, and are not corroborated by additional credible evidence before the Court that the Children were ever exposed to such violence.  Even if the Court were to interpret Petitioner's messages and find his statements to be true, nothing indicates that Petitioner hitting Y.A. was anything more than "sporadic incidents of physical discipline," which does not constitute a grave risk.  *See Souratgar*, 720 F.3d at 104.

Further, the law enforcement reports before the Court do not corroborate Respondent's allegations.  The Canadian and New York police reports do not support the notion that the Children would be exposed to a grave risk upon return.  The August 18, 2024, CPS report does not identify how CPS reached its conclusion that the Children would experience physical or psychological harm or whether that harm rises to the level of grave risk.  Indeed, to the extent that the reported harm to the Children was based on the domestic violence of Petitioner, such actions do not present an intolerably grave risk to the Children and the report does not otherwise exhibit the Children's exposure to such abuse.  *See Souratgar,* 720 F.3d at 104.  Respondent also did not allege harm to

anyone but herself when she reported to the RCMP.  While there may be evidence that Petitioner exerted physical, psychological, and/or coercive control over Respondent, the proffered evidence does not establish by clear and convincing evidence that Petitioner poses a grave risk to the Children.  *See Grano*, 821 Fed. App'x at 28.

Additionally, although Respondent alludes to the Family Court social worker's report, there is still no showing in the record that the Children were or will be exposed to a grave risk of harm. Further, Canada is equipped to properly address these purported findings and mitigate the risk of any harm to the Children pending a final custody determination.[11]  The RCMP records prior to the family's departure indicate responsiveness, awareness, and sensitivity to the parties' case by police officers and social workers.  *See Souratgar v. Fair*, 12-CV-7797 (PKC), 2012 WL 6700214, at *11 (acknowledging that Singapore was equipped to address alleged risk of harm to child upon his return and had adequate protections in place to prevent harm to the child pending a final custody determination).  To the extent that Respondent argues that the Children's loss of access to her constitutes a grave risk of harm, "the possible loss of access by a parent to the child does not constitute a grave risk of harm *per se* for Article 13(b) purposes." *Souratgar*, 720 F.3d at 106.

Respondent's argument that return would expose the children to a grave risk of harm because they lack legal status and healthcare in Canada is similarly unsubstantiated.  Respondent does not establish that the Children will not otherwise be "adequately protected."  Petitioner has

---

[11] *See, e.g., Souratgar v. Fair,* 12-CV-7797 (PKC), 2012 WL 6700214, at *6 ("When making a grave risk determination, the court must also consider whether the child can be protected from the risk of harm 'while still honoring the important treaty commitment to allow custodial determinations to be made—if at all possible—by the court of the child's home country '  Accordingly, in its deliberation of whether there is a grave risk of harm, the Court takes into account 'any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation' 'In cases of serious abuse, before a [district] court may deny repatriation on the ground that a grave risk of harm exists under Article 13(b), it must examine the full range of options that might make possible the safe return of a child to the home country.'"  (first quoting *Blondin II,* 189 F.3d at 248; then quoting *Blondin IV,* 238 F.3d at 163 n.11), *aff'd sub nom. Souratgar,* 720 F.3d.

acknowledged his ability to receive healthcare for the family through his job in Canada. Respondent's claims that the Children would be exposed to a grave risk of harm in Canada because they would lack legal status is also unfounded.[12]  A.A. was born in Canada and, as to M.A. and Y.A., Petitioner has stated that he has applied for permanent residence in Canada as a pathway for citizenship for the entire family.

Respondent has not established by clear and convincing evidence that return of the Children to Canada would expose them to war, famine, disease or lack of adequate protection. Respondent has therefore failed to meet her burden in establishing by clear and convincing evidence that the Children will be exposed to a grave risk of harm if returned to Canada.

### 2.  Well-Settled Defense

When a child has been wrongfully retained and less than one year has elapsed between the date of the wrongful retention and the date of the commencement of the proceedings, the Court shall order the return of the child.  *See* Hague Convention art. 12.  However, if the proceedings have been commenced more than one year after the date of wrongful retention, the court shall order the return of the child "unless it is demonstrated that the child is now settled in its new environment."  *Id.*  Consequently, the "well-settled" defense is only available when the

---

[12] The Court construes Respondent's argument here as a misplaced attempt at arguing the Children's habitual residence is the United States.  The Hague Convention discourages consideration of nationality in determination of habitual residence.  *See Monasky,* 589 U.S. at 79 ("The Hague Conference deliberately chose 'habitual residence' . . . for the Convention[']s return remedy in lieu of formal legal concepts like domicile and nationality"); *see, e.g. Rydder v. Rydder,* 49 F.3d 369, 373 (8th Cir. 1995) (holding that the children's official residency was a "legal fiction" and of little consequence to the determination of their habitual residence); *Blackledge v. Blackledge,* 866 F.3d 169 (3d Cir. 2017) (concluding that the child's habitual residence was the United States "notwithstanding his American citizenship").  Furthermore, a pending asylum application is not a defense under the Hague Convention, and the Court has the authority to order the Children's return despite an asylum application.  *See Salame v. Tescari,* 29 F.4th 763, 772-73 (6th Cir. 2023); *Jose Junior v. Ferreira de Sousa,* 21-CV-02242, 2023 WL 4228163, at *6-7 (N.D. Ohio June 27, 2023) ("Hague and asylum cases have different evidentiary burdens.").  Thus, the Court accords little weight to the legal status of the Children and Respondent's pending asylum application in its consideration of their habitual residence and Respondent's grave-risk defense.

proceedings were commenced over a year after the wrongful removal or retention. *See Lozano*, 697 F.3d at 51-52.

While the case of a child's wrongful removal is more easily fixed, the date of a wrongful retention, while also occurring on a fixed date, can be more difficult to determine. *See Marks ex rel. SM v. Hochhauser*, 876 F.3d 416, 420, 422 (2d Cir. 2017). Respondent wrongfully retained the Children, so the Court must determine upon which fixed date the one-year period began to run and whether one year had elapsed before this action was brought. Only if one year had elapsed may the Court consider Respondent's well-settled defense. Petitioner filed the instant proceedings on August 7, 2025, thus any retention date after August 7, 2024, constitutes less than a year for the purposes of considering the well-settled defense. *See Lomanto v. Agbelusi,* 22-CV-7349 (JPO), 2023 WL 4118124, at *14 (S.D.N.Y. June 22, 2023) (The well-settled defense was available where wrongful retention occurred on August 24, 2021, and the action was filed on August 26, 2022.).

The decisive date in wrongful retention cases "should be understood as that on which the child ought to have been returned to [his or her] custodians or on which the holder of the right of custody refused to agree to an extension of the child's stay in a place other than that of its habitual residence." Pérez-Vera Report ¶ 108. In cases where there was no fixed date for the child's return, the Second Circuit considers the date of wrongful retention to be the date that the respondent informed petitioner they would not be returning with the children. *See Marks ex rel.* 876 F.3d at 422 (The date of wrongful retention was the date when the respondent emailed the petitioner that she and the children would not be returning.); *Hofmann*, 716 F.3d at n.6 (The date of wrongful retention was the same date that the petitioner was served with divorce papers because, thereafter, he "was on notice that he was prevented from exercising his custody rights."); *see also Gitter v. Gitter*, 03-CV-3374 (DGT), 2003 WL 22775375, at *4 (E.D.N.Y. Nov. 20, 2003) (The retention

occurred when the petitioner knew the respondent was not going to return the child to his habitual place of residence.).

Courts have also considered the date of wrongful retention as the date when the petitioner withdrew their consent to the child's stay in tandem with the date when the respondent informed petitioner they would not return. *See Lomanto v. Agbelusi*, 23-CV-993, 2024 WL 3342415, at *2 (2d Cir. July 9, 2024) (affirming that the date of wrongful retention was the date the respondent advised the petitioner that she would be staying in New York, which was the same "date of disappearance" the petitioner placed on the police report because those events "made clear that [respondent] advised [petitioner] that she would retain children in New York over his objection."); *see also Swett v. Bowe*, 733 F. Supp. 3d 225, 278 (S.D.N.Y. 2024) (The petitioner "did not volitionally acquiesce or consent to [the respondent's] continued retention" of the child after the return date the parties set because he lacked any practicable ability to control the respondent's decision of return and, after that date, neither parent had any firm belief that the respondent would return the child.), *aff'd sub nom., Urquieta v. Bowe,* 120 F.4th 335 (2d Cir. 2024).

Here, there was no fixed date for the Children to return to Canada. The Court therefore must determine which day Petitioner was put on notice that Respondent would not be returning with the Children and withdrew his consent to their stay in New York. The candidates are August 4, August 9, or August 12, 2024. On August 4, 2024, Petitioner called the NYPD based on Respondent's past threats of not returning the Children. On August 9, 2024, he texted the RMCP that Respondent was threatening him that she would take the Children and he would never see them again, and stating that she had all the Children's passports. In the same message, Petitioner expressed concern that Respondent was forcing him to stay in the United States illegally. On

August 12, Petitioner returned to Canada upon the belief that he would not succeed in bringing the Children back because Respondent held the Children's passports.

The Court finds that August 9, 2024, was the date of wrongful retention. As early as August 9, 2024, Petitioner was put on notice that Respondent intended to stay in New York with the Children against his consent, evidenced by his text to the RCMP that he felt forced by Respondent to stay in the United States. On that date, he expressed concern that Respondent would take the Children, unlike his August 4, 2024, call to NYPD referencing Respondent's prior threats. Additionally, on August 12, 2024, he left the United States upon the belief that he lacked any practicable ability to control Respondent's retention of the Children as he did not have access to their passports.[13] Petitioner's call to NYPD on August 4, 2024, is not the date of wrongful retention as Petitioner did not revoke his consent to the Children remaining in the United States at that time. He remained with them for eight more days, and his communications to the Canadian and New York Police prior to August 9, 2024, do not indicate that he was on notice that he was prevented from exercising his custody rights. Nor was his call to NYPD tantamount to making a formal police report alleging a date of disappearance as in *Lomanto*; he called NYPD out of concern of Respondent's prior threats to take the Children, not any current threat that she was refusing their return.

Respondent has not persuaded the Court by a preponderance of the evidence that the Children had been settled in New York for more than one year or that Petitioner otherwise consented to their retention more than a year before he commenced these proceedings. *See* 42 U.S.C. § 11603(e)(2)(B).

---

[13] Even though August 9, 2024, was the date of wrongful retention, August 12, 2024, was also within a year of the Petition being filed.

### 3. Violation of Human Rights and Fundamental Freedoms Defense

Article 20 of the Hague Convention provides that repatriation "may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." *Souratgar*, 720 F.3d at 108 (quoting Hague Convention art. 20). "The article is to be 'restrictively interpreted and applied'" and "invoked only on 'the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process.'" *Id.* (quoting Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10494 (Mar. 26, 1986)). Respondent must therefore demonstrate by clear and convincing evidence that the United States' "fundamental principles . . . relating to the protection of human rights and fundamental freedoms ought to be held to bar the return of the Children. *See* Hague Convention art. 20; 42 U.S.C. § 11603(e)(2)(A). To refuse to return children under Article 20, "it will be necessary to show that the fundamental principles of the requested State concerning the subject matter of the Convention do not permit it; it will not be sufficient to show merely that its return would be incompatible, even manifestly incompatible, with these principles." Pérez-Vera Report ¶ 118.

Plainly, Respondent's claims that the Children would be denied access to education in their religious tradition, lack healthcare, and be exposed to danger do not rise to the level contemplated by the Article 20 defense. There is no evidence before the Court that return to Canada would deny the Children access to education in their Muslim faith, as the Children were previously and successfully enrolled in school in Canada without issue as to their faith. Additionally, as discussed *supra*, Petitioner has stated he will provide healthcare for the family and the Children face no grave risk upon return. Return of the Children to Canada would neither be incompatible with the United

States' laws or due process, nor would it be beyond the pale of that which would be tolerated. Respondent has not established by clear and convincing evidence otherwise.

### 4. Consent or Acquiescence Defense

Under Article 13, a contracting state is not required to return a child where the petitioner consented to, or subsequently acquiesced in, the child's removal or retention. Hague Convention art. 13(a). "[A]cquiescence is a question of the actual subjective intention of the wronged parent, not of the outside world's perception of his intentions." *In re Koc*, 181 F. Supp. 2d 136, 151 (E.D.N.Y. 2001) (quoting *Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1288 (S.D. Fla. 1999)). "When evaluating a consent defense, a court must consider the 'nature and scope of the petitioner's consent, and any conditions or limitations.'" *Tereschenko v. Karimi*, 23-CV-2006 (DLC), 2024 WL 80427, at *8 (S.D.N.Y. Jan. 8, 2024) (quoting *Baxter*, 423 F.3d at 371).

Petitioner traveled to New York under the impression that Respondent and Children were renewing their Ukrainian passports. His conditional consent to the removal did not operate to divest him of his right to object to the retention thereafter. Similarly, his subjective intent to accompany the family to renew passports did not equate to his consent that the Children remain in the United States permanently. *See A.A.M. v. J.L.R.C.*, 840 F. Supp. 2d 624, 639 (E.D.N.Y. 2012); *see also Hofmann,* 716 F.3d at 295 ("[A]lthough [the petitioner] initially consented to the children's removal to the United States, that consent was conditioned upon his accompanying them and residing in this country as a family with his children and wife . . . Because the condition on which Hofmann consented to his children moving to the United States was not met, there is no basis to conclude that he consented to [the respondent's] retention of the children in the United States."); *Baxter*, 423 F.3d at 370-71 ("Article 13(a) does not provide that if a parent consents to removal of the child for a period, under certain conditions or circumstances, that retention of the child beyond

33

those conditions or circumstances is necessarily permissible."). Petitioner never consented to the Children's retention in New York. In fact, Petitioner's lack of consent to the Children's retention is evidenced by his contacting the RMCP and NYPD and expressing concern that Respondent would either take the children or not turn over their passports. It is apparent that Petitioner intended for the Children to return to Canada after their passports were renewed but was prevented from doing so because Respondent prohibited his access to their travel documents by Petitioner.

Accordingly, the Court finds that even though not raised by Respondent as a defense, Petitioner's consent or acquiescence to the wrongful retention is unsupported and thus fails to overcome Petitioner's *prima facie* case.

### 5. Court's Discretion to Order Return

Furthermore, even assuming that Respondent met her burden in establishing any of the foregoing affirmative defenses, the Court retains the discretion to return the Children to Canada "if return would further the aims of the Convention." *Blondin II,* 189 F.3d at 246 n.4 (2d Cir. 1999) (quoting *Friedrich*, 78 F.3d at 1067). The foregoing defenses require far more evidence than Respondent has provided. This is coupled with the fact that Respondent wrongfully retained the Children in the United States, thereby breaching Petitioner's custody rights. The Court finds that there is inadequate compelling evidence to warrant the Children's stay in the United States.

### D. Jurisdiction

Without specifically challenging the Court's jurisdiction, Respondent spent significant time at the Hearing arguing that the Court was barred from ordering the Children's return to Canada by the Family Court's Protective Order. [TRANSCRIPT]; *see also* Respondent's Supplemental Memorandum of Law in Opposition to Hague Petition and In Support of Enforcement of Family Court Order of Protection at 2, Dkt. 29. The Court again reiterates that its role is not to determine

the custody of the Children.  The Court has authority under the Hague Convention and ICARA to determine which Central Authority shall determine the Children's custody.  Determining whether the Children be returned has no bearing on whether Petitioner can or cannot contact the Children; that remains an issue to be sorted by the Canadian courts.  *See, e.g.*, *Mendez Lynch v. Mendez Lynch,* 220 F. Supp. 2d 1347, 1366 (M.D. Fla. 2002) (granting petition and ordering a father to take two children back despite a mother obtaining a domestic violence injunction against the father in Florida state court).  Petitioner's Protective Order does not bar this Court's appropriate exercise of jurisdiction.  Any finding to the contrary would inappropriately concede the Court's authority and the objective of the Hague Convention, and risk rewarding Respondent for her wrongful behavior in retaining the children in New York and unilaterally revoking Petitioner's exercise of his custody rights.

### E.  Fees and Costs

Petitioner also seeks an order directing Respondent to pay him for all costs and fees incurred to date pursuant to 42 U.S.C. § 11607.  Pet. at 17-18.  ICARA provides that any court that orders the return of a child under the Hague Convention "shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate."  42 U.S.C. § 11607(b)(3).  The Court has broad discretion with respect to fees and costs in its effort to comply with the Hague Convention.  *See West,* 735 F.3d at 932.

Petitioner brought this action pursuant to 42 U.S.C. § 11603 seeking the return of his three children.  This Court orders the Children be returned to Canada.  Both parties are *pro se*, so there are no attorney's fees to award.  Both parties shall bear their own legal costs and fees.

As to the transportation costs related to the return of the Children, given that Respondent financially provides for the Children in addition to her reliance on Petitioner's child support, that Petitioner would have otherwise paid for the Children's travel back to Canada before their wrongful retention, and for ease of making travel arrangements for the Children back to Canada, the Petitioner's request that Respondent pay the costs required to effectuate the return of the Children to Canada is denied.

**CONCLUSION**

For the foregoing reasons, the Court finds that Petitioner has established, by a preponderance of the evidence, a *prima facie* case of wrongful retention under the Hague Convention and ICARA. The Court also holds that Respondent has failed to satisfy the burden of any affirmative defense by either a preponderance of the evidence or clear and convincing evidence, as applicable. Therefore, the Court grants the petition to return Y.A., M.A., and A.A. to Canada. Y.A., M.A., and A.A. shall be returned to Canada by November 14, 2025, for the issue of custody to be decided by a court in Canada.

The Court further orders the parties to contact the EDNY ADR Administrator, Danielle B. Shalov, Esq. at (718) 613-2578 and/or danielle_shalov@nyed.uscourts.gov by November 3, 2025, for a mediation regarding reasonable arrangements for promptly returning Y.A., M.A., and A.A. to Canada, and that the Court be provided with a detailed plan by November 7, 2025, for the safe return of Y.A., MA., and A.A. to Canada, which shall include to whom the Clerk of Court shall release the Children's passports, who will accompany the Children back to Canada, and where the Children will stay in Canada. The Court further orders that Y.A., M.A., and A.A. shall be returned to Canada at Petitioner's expense, and each party shall bear its own costs for this action.


SO ORDERED.

/s/_____
ORELIA E. MERCHANT
United States District Judge

October 31, 2025
Brooklyn, New York