UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ABDELRAHMAN ABOUELMAGD,

                Petitioner,                **<u>MEMORANDUM AND ORDER</u>**

        -against-              25-CV-4402 (OEM) (RML)

TETIANA SEMENIUK,

                Respondent.
------------------------------------------------------------------x

ORELIA E. MERCHANT, United States District Judge:

    *Pro se* respondent Tetiana Semeniuk ("Respondent") filed two requests for a stay pending appeal and filed a motion for reconsideration of the Court's October 31, 2025, Memorandum and Order ("October 31 Order"), Dkt. 33, granting the petition filed by Amr Abdelrahman Abouelmagd ("Petitioner") pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670 (the "Hague Convention"), and the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* ("ICARA"). For the following reasons, Respondent's requests for a stay, Dkt. 35 and 36, and motion for reconsideration, Dkt. 40, are denied.

## BACKGROUND

    Petitioner filed this Hague Convention petition on August 7, 2025, seeking return of his three children Y.A., M.A., and A.A. (the "Children"), who had been wrongfully retained in New York by their mother, Respondent, in August 2024. *See* Verified Petition for Return of the Children to Canada ("Petition"), Dkt. 1. The October 31 Order sets forth the relevant facts, which are summarized here. *Abouelmagd v. Semeniuk*, 25-CV-04402 (OEM) (RML), 2025 WL 3042413, (E.D.N.Y. Oct. 31, 2025). Familiarity with the October 31 Order is assumed.

Petitioner is a citizen of Egypt, and Respondent is a citizen of Ukraine. The Children, who are two, four, and seven years old, are habitual residents of Canada. The Children are citizens of Ukraine, but Y.A. was born in the United Arab Emirates, M.A. was born in the United States, and A.A. was born in Canada.

Respondent and Petitioner made the mutual decision to move the family from Dubai to Canada in 2021. Respondent arrived in Canada with the Children in August 2022, and Petitioner joined them in May 2023. Respondent and the Children had received Canadian Ukrainian Authorization for Emergency Travel ("CUAET") visas, which permitted them to reside in Canada for three years. Neither party has produced any real time reports by Respondent that Petitioner was harming the Children during the entirety of the family's residence in Canada.

In late 2023, the parties' relationship began to deteriorate. The Royal Canadian Mounted Police ("RCMP") was called to the family's household on three occasions in 2023 based on reports of alleged domestic violence of Respondent by Petitioner. In June and July 2024, Petitioner made allegations to the Canadian Ministry of Children and Family Development that Respondent had hog-tied Y.A. On July 20, 2024, the Ministry investigated the matter further at the family home and eventually ordered Respondent to reside elsewhere for three nights.

While residing elsewhere, Respondent sent a text to her biological daughter, A.S., telling her to pack their bags. When she arrived back to the family home on July 25, 2024, Respondent insisted that the family leave Canada to the United States to renew the Children's Ukrainian passports. Respondent asserts that she also urged the family to leave because the Children's CUAET visas were expiring (M.A.'s as early as August 31, 2024).

Petitioner felt that he had no alternative but to comply and traveled with the Respondent and Children first to Seattle. Petitioner believed that the family was going to renew the Children's

passports and would return to Canada afterwards.  When the embassy wait-time in Seattle was too long, the family then traveled to New York on August 3, 2024.  On August 9, 2024, Petitioner contacted the RCMP stating that Respondent was threatening to take the Children and that he would never see them again because Respondent had the Children's passports and was forcing him to stay in the United States illegally.  On August 12, 2024, upon the belief that he could not return with the Children, Petitioner returned to Canada alone.  On August 21, 2024, Respondent received a protective order from the New York State Family Court in Queens County ("Family Court") ordering Petitioner to stay away from Respondent and the Children ("Protective Order"), which has been renewed and is effective through February 6, 2026.  On or about November 4, 2024, Respondent filed for asylum status in the United States for herself, Y.A., and A.A.  Respondent obtained a divorce decree from a Ukrainian court, effective November 12, 2024.  The divorce decree made no finding as to the Children's custody, rejecting Respondent's claim to determine the place of residence of the Children with her.  There is no custody order in place.

Since the filing of the Petition on August 7, 2025, the Court has held three hearings, two of which Respondent appeared for once she had been served with the Petition.  The Court issued its decision on October 31, 2025, ruling that Respondent wrongfully retained the Children in New York in breach of Petitioner's custody rights and ordering that the Children be returned to Canada by November 14, 2025, for their custody to be determined by a Canadian court.  The parties were further ordered to discuss the logistics of the Children's return to Canada with the Eastern District of New York Alternative Dispute Resolution Administrator.

On November 3, 2025, Respondent filed two motions to stay the October 31 Order: (1) an emergency motion to stay, *see* Emergency Motion for Stay of the Court's Return Order Pending Appeal, Dkt. 35 ("First Motion to Stay" or "First Mot."); Notice of Respondent's Motion for Stay

Pending Appeal, Dkt. 35-1; Respondent's Motion & Memorandum of Law in Support of Stay Pending Appeal, Dkt. 35-2 ("First Mot. Mem."); Respondent's Supplemental Memorandum of Law (Updated Evidence – October 28, 2025), Dkt. 35-3; Declaration of Tetiana Semeniuk, Dkt. 35-4, and (2) a second motion to stay, *see* Respondent's Motion to Stay Return Order Pending Appeal, Dkt. 36 ("Second Motion to Stay" or "Second Mot.").[1]   On November 3, 2025, Respondent also filed a notice of appeal.  Respondent's Statement of Errors and Clarifications on Appeal, Dkt. 37.

On November 4, 2025, the Court requested Petitioner file a response, if any, to Respondent's motions to stay by 12:00 p.m. (ET) on November 5, 2025.  That same day, Petitioner filed a response to Respondent's notice of appeal.  Petitioner's Response to Respondent's Appeal, Dkt. 39.   Therein, Petitioner identifies several reasons why Respondent will not likely be successful on appeal such that the Court construes this response as Petitioner's opposition to Respondent's motions to stay.

On November 5, 2025, Respondent submitted to the Court's Pro Se Office a notice informing the Court that she has filed a request for action from the Department of Homeland Security, which seeks to cancel the October 31 Order, *see* Notice to the Court at 1-5,[2] Dkt. 40, ("Notice to the Court")[3] and attached thereto a Motion for Reconsideration and Correction of Legal

---

[1] Respondent asserts that if the Court denies her stay, she will seek a stay from the Court of Appeals for the Second Circuit.  Second Mot. at 1, Dkt. 36.

[2] All page citations correspond to the ECF PageID pagination.

[3] In her Notice to the Court, Respondent raises entirely novel claims as to the Children's religious freedom and education, which she also now appears to add as a basis of her pending asylum claim, *see* Notice to the Court at 3, Dkt. 40, and attaches a letter purportedly written by Y.A. that she has not previously filed, *see*  Notice to the Court at 16, Dkt. 40.  To the extent that Respondent attempts to raise new issues for review on appeal, "'[i]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.'"  *See Askins v. Doe No. 1,* 727 F.3d 248, 252 (2d Cir. 2013) (quoting *In re Nortel Networks Corp. Sec. Litig.,* 539 F.3d 129, 132 (2d Cir. 2008)).

Errors and Request to Affirm DHS Protection for Children, *id.* at 6-18, Dkt. 40 ("Motion for Reconsideration"), (entered on the docket by the Clerk's office on November 7, 2025).

**DISCUSSION**

**A. Motion for Reconsideration**

Respondent seeks reconsideration of the October 31 Order, asserting that the Court made "judicial errors and violations of federal law." Motion for Reconsideration at 6-9, Dkt. 40. She also raises new requests for relief including requests for recognition of "DHS exclusive jurisdiction over Respondent's pending asylum case and derivative protections," for acknowledgment "that federal law bars removal or transfer," and for an order that Y.A., M.A. and M.A. remain in the United States under DHS protection. *Id.* at 10. She further requests to "[d]ismiss the Hague Convention petition in respondent's favor, as further enforcement would violate federal law and constitutional rights." Motion for Reconsideration at 6, 10, Dkt. 40.

As an initial matter, the Court addresses whether it has jurisdiction to consider Respondent's motion for reconsideration, given that it was filed after her notice of appeal. Although the Federal Rules of Civil Procedure do not provide for a "motion for reconsideration," such motion "may be construed as a motion to alter or amend judgment under Rule 59(e) or Rule 60(b)." *Hill v. Washburn,* 08-CV-6285 (CJS), 2013 WL 5962978, at *1 (W.D.N.Y. Nov. 7, 2013) (citing *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 174 (1989)).

The filing of a notice of appeal "confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58 (1982). However, "if a party files a timely motion to alter or amend the judgment, *see* FED. R. APP. P. 4(a)(4)(A)(iv), and files a notice of appeal before the district court disposes of that motion, then the notice of appeal does not become

5

effective until the order disposing of that motion is entered, *see* FED. R. APP. P. 4(a)(4)(B)(i)." *Biehner v. City of New York,* 19-CV-9646 (JGK), 2021 WL 5827536, at *2 (S.D.N.Y. Dec. 8, 2021). In addition, courts in this Circuit have concluded they have jurisdiction to resolve Rules 59(e) and 60(b) motions filed after a notice of appeal is filed. *See Martinez v. Hasper*, 15-CV-5724 (EK) (LB), 2022 WL 118720, at *1 (E.D.N.Y. Jan. 12, 2022) (collecting cases). Alternatively, pursuant to Federal Rule of Civil Procedure 62.1(a), the Court may address the pending motion through an indicative ruling. Given that Respondent is *pro se* and the foregoing authority, the Court considers the pending motion for reconsideration.

To succeed on a motion for reconsideration, the movant must show "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Metzler Investment Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 142 (2d Cir. 2020) (citations omitted). A motion for reconsideration "is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking [another] bite at the apple." *U.S. for Use & Benefit of Five Star Elec. Corp. v. Liberty Mut. Ins. Co.*, 758 F. App'x 97, 101 (2d Cir. 2018) (alteration in original) (quoting *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012)). Nor is it "an opportunity for a [party] to . . . present arguments that could have been made before the judgment was entered." *Ethridge v. Bell*, 49 F.4th 674, 688 (2d Cir. 2022) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)). Reconsideration of a court's previous order is "an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 300 (S.D.N.Y. 2005) (citations omitted), *aff'd sub nom. Tenney v. Credit Suisse First Bos. Corp., Inc.*, 05-CV-3430, 05-CV-4759, & 05-CV-4760, 2006 WL 1423785, at *1 (2d Cir. 2006). The decision to grant or deny a motion for

reconsideration is within "the sound discretion of the district court." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (citation omitted).

Respondent does not raise any intervening change of controlling law under the Hague Convention or any new evidence that is proper for this Court's consideration. Respondent claims that the Court clearly erred in the conclusions it made in its October 31 Order. "[T]o justify review of a decision, the Court must 'have a clear conviction of error on a point of law that is certain to recur.'" *Turner v. Vill. Of Lakewood*, 11-CV-211 (A), 2013 WL 5437370, at *3 (W.D.N.Y. Sept. 27, 2013) (quoting *U.S. v. Adegbite*, 877 F.2d 174, 178 (2d Cir. 1989)), *aff'd*, 594 F. App'x 25 (2d Cir. 2015). Respondent suggests that the Court violated 8 U.S.C. § 1158(a)(1), 8 C.F.R. §§ 208.2 & 208.22, and the Supremacy Clause by "declar[ing] that asylum is not a defense." Motion for Reconsideration at 6-7, Dkt. 40. She states that the October 31 Order "violates 14th Amendment Due Process and Equal Protection" because M.A. is a U.S. citizen. *Id.* at 6. She also argues that the October 31 Order "disregarded" the Protective Order and violated "VAWA § 2265" and "FCA § 842." *Id.*

The Court has not made a "jurisdictional overreach" by not considering the Y.A. and A.A.'s asylum applications and thus, the Court has not committed clear error in its October 31 Order by "disregarding 8 U.S.C. § 1158(a)(1), 8 C.F.R. §§ 208.2 & 208.22." Motion for Reconsideration at 6, Dkt. 40. Y.A. and A.A. have applied for asylum and withholding of removal, but there is no evidence that their application has been granted. To date, the Court is only aware that Y.A. and A.A. have applied for asylum and withholding of removal according to their "I-589 – Application for Asylum and For Withholding of Removal" ("Asylum and Withholding Application"), "received" on November 4, 2024. *See* Respondent's Supplemental Memorandum of Law in

Opposition to Hague Petition and In Support of Enforcement of Family Court Order of Protection at 26, Dkt. 29.

A noncitizen physically present in the United States may apply for asylum in accordance with 8 U.S.C. § 1158. 8 U.S.C. § 1158 establishes the conditions for granting asylum, 8 U.S.C. § 1158(b), and further provides that once a noncitizen is granted asylum, "the Attorney General . . . shall not remove or return the alien to that alien's country of nationality," *id.* § 1158(c)(1)(A). Further, 8 C.F.R. § 208.2 summarizes the jurisdiction that U.S. Citizenship and Immigration Services and immigration courts have over asylum applicants and 8 C.F.R. § 208.22 prohibits removal of an asylum applicant that has been granted withholding of removal or deportation or deferral of removal. Y.A. and M.A.'s Asylum and Withholding Application expressly states that

> You *may* remain in the United States until your asylum application is decided. Having a pending asylum application with USCIS does not preclude [ICE or CBP] from placing you into removal proceedings. If you wish to leave the United States while your application is pending, you must obtain advance parole . . . .

Respondent's Supplemental Memorandum of Law in Opposition to Hague Petition and In Support of Enforcement of Family Court Order of Protection at 26, Dkt. 29 (emphasis added). Respondent has not proffered that Y.A. and M.A.'s Asylum and Withholding Application has been granted such that their "removal" is prohibited by 8 U.S.C. § 1158 or 8 C.F.R. § 208.22. Moreover, the language of the Asylum and Withholding Application itself contradicts the notion that Y.A. and A.A. are prevented from leaving the United States.

The Court addressed the Children's pending asylum application, October 31 Order at n.12, and remains persuaded by the analysis of other circuit courts that have been faced with the issue of children whose asylum applications are granted either before or during the proceedings of a Hague Convention case. *See Sanchez v. R.G.L.,* 761 F.3d 495, 509-11 (5th Cir. 2014) (vacating and remanding district court's decision where the children were granted asylum during appeal of

district court's order that the children be returned for the district court to consider applicability of asylum evidence to the affirmative defenses); *Salame v. Tescari,* 29 F.4th 763, 771-73 (6th Cir. 2022) (affirming district court's order that the children be returned where the children were granted asylum before the district court's order). While the grant of asylum may be relevant to whether the Hague Convention affirmative defenses apply, it "does not remove from the district court the authority to make controlling findings on the potential harm to the Child." *See Sanchez* 761 F.3d at 510; *see also Salame,* 29 F.4th at 771-72. Here, where asylum has not been granted, the Court did not err in deciding the petition under The Hague Convention during the pendency of Y.A. and A.A. Asylum and Withholding Application. *See, e.g., Sanchez v. Sanchez,* SA-12-CA-568, 2012 WL 5373461, at *4-5 (W.D. Tex. Oct. 30, 2012) (denying motion to stay despite the children's pending asylum applications because a prompt decision under the Hague convention outweighed the merits of a stay).

Even if Y.A. and M.A's asylum applications were to be granted, no authority has been offered to show that "the discretionary grant of asylum confers a right to remain in the country despite judicial orders under the Hague Convention" or that 8 C.F.R. § 208.2 divests the Court of its jurisdiction to consider a Hague Convention petition. *See Sanchez,* 761 F.3d at 510 (rejecting argument that grant of asylum superseded district court's order, stating "[t]he asylum grant does not supercede enforceability of a district court's order that the children should be returned to [the petitioner] as that order does not affect the responsibilities of either the Attorney General or Secretary of Homeland Security under the INA." (citing *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 173 (1993))).

As to Respondent's argument that M.A.'s citizenship in the United States and Fourteenth Amendment due process rights[4] prohibit return, Motion for Reconsideration at 7, the Court reiterates that citizenship is not an appropriate consideration for habitual residence nor is a child's nationality an express affirmative defense. *See* October 31 Order at n.12; *see also Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005) (establishing standard to determine habitual residence but not including consideration of child's nationality); *Monasky v. Taglieri,* 589 U.S. 68, 79 (2020) (noting that the Hague Convention conference "deliberately chose 'habitual residence' for its factual character, making it the foundation for the Convention's return remedy in lieu of formal legal concepts like domicile and nationality." (quoting Anton, the Hague Convention on International Child Abduction, 30 Int'l & Comp. L. Q. 537, 544 (1982)).  The affirmative defense based on violation of human rights and fundamental freedoms under Article 20 of the Hague Convention must be established by clear and convincing evidence and is only invoked "on 'the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process.'"  *Souratgar v. Lee,* 720 F.3d 96, 108 (2d Cir. 2013) (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986)).  To refuse to return children under Article 20, "it will be necessary to show that the fundamental principles of the requested State concerning the subject matter of the Convention do not permit it; it will not be sufficient to show merely that its return would be incompatible, even manifestly incompatible, with these principles."  ELISA PÉREZ-VERA, EXPLANATORY REPORT ("PÉREZ-VERA REPORT") ¶ 118 (1981).

---

[4] While Respondent argues M.A.'s Fourteenth Amendment rights are implicated, these rights apply to state action. The Court liberally construes Respondent's argument to mean M.A.'s Fifth Amendment due process rights, as such rights apply to federal actions.

The Court has ordered that the Children be returned to Canada pending a custody determination by a Canadian court.  The Court has not ordered permanent removal of the Children from the United States.  Particularly, with respect to M.A., contrary to Respondent's assertion, the Court has not made a citizenship determination or permanent custody determination such that M.A.'s due process rights are extinguished.  Under the Hague Convention, the Court does not have the jurisdiction to make an affirmative custody determination; it is solely involved in determining which jurisdiction is best suited to make a custody determination.  *See Monasky,* 589 U.S. at 72. Indeed, the Article 20 defense is not to be used "as a vehicle for litigating custody on the merits." *Souratgar,* 720 F.3d at 108.  Therefore, because M.A.'s Fifth Amendment rights have not been adjudicated by this Court, the October 31 Order did not violate due process requirements or strip M.A. of any protected interest.  Finding that the public policy interests of the United States would not be offended by allowing a Canadian court to adjudicate the custody dispute of the Children, the Court did not clearly err in concluding that Respondent failed to meet her burden in establishing the violation of human rights and fundamental freedoms affirmative defense.

Respondent argues the Court "disregarded" the Protective Order and thus violated "VAWA § 2265" and "FCA § 842."  Motion for Reconsideration at 6-7, Dkt. 40.  Pursuant to 18 U.S.C. § 2265, *states* are required to accord "full faith and credit" to any protection order that is issued consistent with the requirements of 18 U.S.C. § 2265(b).  N.Y. FAM. CT. ACT § 842 sets forth the requirements of an order of protection issued by a New York court.

Even if the Protective Order granted Respondent custody of the Children, and there is no evidence that it has, "[t]he sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention, but the judicial or administrative authorities of the requested State may

11

take account of the reasons for that decision in applying this Convention." Hague Convention art. 17. A primary purpose of the Hague Convention was to prevent situations where a family member would remove a child 'to jurisdictions more favorable to [his or her] custody claims in order to obtain a right of custody from the authorities of the country to which the child ha[d] been taken.'" *Mota v. Castillo,* 692 F.3d 108, 112 (2d Cir. 2012) (quoting *Gitter,* 396 F.3d at 129); *see also Tann v. Bennett,* 807 F.3d 51, 53 (2d Cir. 2015) ("holding that [the petitioner's] petition is moot because [the respondent] received a favorable custody determination in a potentially friendlier New York court could encourage the jurisdictional gerrymandering that the Hague Convention was designed to prevent."). Here, Respondent urged the family to travel to the United States right after she returned from her mandated stay away from the family residence and soon after Petitioner left the United States, she unilaterally petitioned for divorce and custody of the Children in a Ukrainian court and obtained the Protective Order from the Family Court in New York. These circumstances suggest that Respondent was seeking a potentially more favorable forum to unilaterally establish her custody rights. The purpose of the Hague Convention is to deter this behavior.

The outcome of the October 31 Order did not violate either 18 U.S.C. § 2265(b) or N.Y. FAM. CT. ACT § 842. By ordering that the Children be returned to Canada for a Canadian court to adjudicate their custody, the Court did not order the Children return to Petitioner's custody and therefore did not order a remedy that violated the Protective Order. The parties were directed to communicate with the Eastern District of New York Alternative Dispute Resolution Administrator to coordinate arrangements for the return of the Children, which allowed Respondent to advocate for consideration of the Protective Order's constraints.

For all intents and purposes, Respondent seeks another "bite at the apple" when she has already had many. Respondent has filed numerous repetitive motions, letters, and attachments

throughout these proceedings without leave of court.[5]  The Court granted Respondent substantial leeway and considered and weighed all of Respondent's voluminous and duplicative filings.  The Court ultimately rejected her arguments and found the evidence weighed in favor of Petitioner.  Reiterating those same arguments now, including arguments related to domestic violence, the Protective Order, and "religious and educational context," Motion for Reconsideration at 7, and novel requests for relief, *id.* at 10, are not bases for reconsideration.  Consequently, Respondent's Motion for Reconsideration is denied.

### B.  Motions to Stay

Respondent seeks a stay of the October 31 Order requiring return of the Children pending her appeal of the decision.  Pursuant to Federal Rule of Civil Procedure 62(c) ("Rule 62(c)"), a district court may stay enforcement of a judgment while an appeal is pending.  A party seeking a stay pending appeal under Rule 62(c) bears a "difficult burden."  *United States v. Private Sanitation Indus. Ass'n*, 44 F.3d 1082, 1084 (2d Cir. 1995).  The court must consider four factors to determine whether to issue a stay pending appeal.

> (1) [W]hether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*DiMartile v. Hochul,* 80 F.4th 443, 456 (2d Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 433-34 (2009)); *see also Chafin v. Chafin*, 568 U.S. 165, 179 (2013) (explaining that courts should apply the four traditional stay factors under *Nken v. Holder* in considering whether to stay a return order in a Hague Convention case).  "To satisfy the 'success on the merits' factor, the moving party

---

[5] *See, e.g.,* Respondent's Declaration in Opposition to Petitioner's Affidavit, Dkt. 21; Respondent's Response to Petitioner's Letter (Dated October 7, 2025), Dkt. 23; Respondent's Short Response and Request for Immediate Denial, Dkt. 25; Urgent Letter to Judge Orelia Merchant, Dkt. 27 to 27-1; Respondent's Supplemental Memorandum of Law in Opposition to Hague Petition and In Support of Enforcement of Family Court Order of Protection, Dkt. 29; and Respondent's Memorandum of Law and Facts, Dkt. 31.

must show that his chance of success on the merits is more than a 'mere possibility.'" *DiMartile,* 80 F.4th at 456 (quoting *Nken,* 556 U.S. at 434)*.* "A stay pending appeal is not a matter of right." *Id.* While the first two factors "are the most critical," "a stay is 'an exercise of judicial discretion', and 'the party requesting a stay bears the burden of showing that the circumstances justify an exercise of discretion.'" *New York v. U.S. Dep't of Homeland Sec.*, 974 F.3d 210, 214 (2d Cir. 2020) (quoting *Nken,* 556 U.S. at 433-34).

"In every case under the Hague Convention, the well-being of a child is at stake; application of the traditional stay factors ensures that each case will receive the individualized treatment necessary for appropriate consideration of the child's best interests." *Chafin*, 568 U.S. at 179. District courts "can and should take steps to decide these cases as expeditiously as possible." *Id.* "[A]ny unnecessary delay renders the subsequent return more difficult for the child, and subsequent adjudication more difficult in the foreign court." *Friedrich v. Friedrich*, 78 F.3d 1060, 1063 (6th Cir. 1996).

Respondent has not shown that any of the four factors weighs in favor of a stay and has therefore not met her burden to justify a stay of the October 31 Order.

### 1. Likelihood of Success on Appeal

Because the Court's ruling did not turn on a novel issue of law but was instead based upon findings of fact, Respondent's chances of success on appeal are low. *See Sanguineti v. Boqvist,* 15-CV-3159 (PKC), 2015 WL 4560787, at \*19 (E.D.N.Y. July 24, 2015) (denying stay pending appeal). Although the Second Circuit reviews *de novo* a district court's interpretation of the Hague Convention and its application of the Hague Convention to the facts, it reviews a district court's factual determinations for clear error. *Mota,* 692 F.3d at 111 (citing *Gitter,* 396 F.3d at 129). More specifically, the Supreme Court has clarified that appellate review of a district court's habitual

residence determination is for clear error. *See Monasky,* 589 U.S. at 71. Similarly, the Court's well-settled defense analysis is subject to review for clear error. *See Lomanto v. Agbelusi,* 23-CV-993, 2024 WL 3342415, at *2 (2d Cir. July 9, 2024).

Respondent states that she has a likelihood of success on appeal on the basis that factual and legal errors exist in the October 31 Order. First, she claims that the October 31 Order incorrectly determined that Canada was the Children's habitual residence. First Mot. at 1, Dkt. 35. Second, Respondent argues that the Court failed to properly consider the following material evidence: (1) the New York Child Protective Services ("CPS" or "ACS") report and Family Court order; (2) the Ukrainian divorce decree; (3) Petitioner's "May 2024 arrest" in the United States and arrest in Canada; and (4) Petitioner's return to his job and the family residence in Canada. First Mot. at 1, Dkt. 35; First Mot. Mem. at 1-4, Dkt. 35-2; Second Mot. at 2-3, Dkt. 36. Third, Respondent argues that the Court erred in making its well-settled defense determination. First Mot. Mem. at 4, Dkt. 35-2. And, last, Respondent contends that the Court mischaracterized immigration and legal status constraints in its Article 13(b) and Article 20 analyses. First Mot. Mem. at 1, 4, Dkt. 35-2; First Mot. at 1, Dkt. 35. The Court takes each of these arguments in turn.

### a. The Court Properly Determined the Children's Habitual Residence.

Respondent contends that the October 31 Order "incorrectly determined" Canada was the Children's habitual residence, First Mot. at 1, Dkt. 35, and "misapplied habitual residence," First Mot. Mem. at 1, 2-3, Dkt. 35-2. The October 31 Order explains the Court's reasoning as to why it concluded that Canada was the Children's habitual residence. October 31 Order at 16-20. Regardless of whether the CUAET visa program was temporary, the parties last mutually intended for the Children to reside in Canada. *Id.* at 16-18. Petitioner reinforces this intent, stating he never consented to the Children being retained in the United States. Petitioner's Response to

Respondent's Appeal at 1, Dkt. 39.  The Children's acclimatization to the United States was not so established prior to their wrongful retention such that returning them to Canada would be tantamount to taking them out of the environment in which their lives had developed.  October 31 Order at 18-20.

### b.  The Court Properly Considered the Evidence.

### i.  ACS Investigation, Family Court Protective Order, and Social Worker Report

Respondent claims that the Court erred in failing to properly consider the ACS investigation and Family Court social worker report recommending against supervised visitation and by not obtaining those reports.  *See* First Mot. at 1, Dkt. 35; First Mot. Mem. at 3, Dkt. 35-2; Second Mot. at 2, 3, Dkt. 36.  She states that the October 31 Order "underweigh[ed] unrebutted safety findings from professionals tasked with child protection [which is a] legal error affecting Article 13(b) and Article 20."  Second Mot. at 3, Dkt. 36.

In the October 31 Order, the Court acknowledged the ACS and Family Court social worker reports to the extent that the reports were filed or evidenced in Respondent's filings.  *See* October 31 Order at 11, n.8.  However, in its analysis of whether the Children faced a grave risk of harm if returned to Canada, the Court credited little weight to them because the record lacked clear and convincing evidence of physical and or psychological harm that would come to the Children.  *Id.* at 24-28.  The Court remains unconvinced that the Family Court social worker's report obtained over a year after the Children had physical contact with Petitioner can demonstrate by clear and convincing evidence that Petitioner subjected the Children to domestic violence, especially given that there is no real time corroborating evidence.  Notably, Respondent cites no contemporaneous reports made during the time the family lived together in Canada finding that the Children were

the target of abuse by Petitioner.  For the same reasons, the Court declined to request or subpoena the documents.

Further, the Court declined to interview the Children given the Children's young ages and likely influence of their mother, with whom they have lived for the past year.  *See* Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986) (recognizing the undue influence an abductor parent may have on a child in considering the child's objections to being returned).  Moreover, the Hague Convention does not require that courts interview children, particularly in light of the need for expedited resolution.

### ii.    Ukrainian Divorce Decree

With respect to the Ukrainian divorce decree obtained *in abstencia* by default judgment on November 12, 2024, after the date of wrongful retention, Respondent now mistakenly construes it to be a custody determination.  *See* Second Mot. at 3, Dkt. 36.  As explained in the October 31 Order, the Ukrainian divorce decree plainly states that Respondent's request to determine the Children's place of residence was "rejected," and the divorce decree made no finding as to the Children's custody.  October 31 Order at 12 (noting that the divorce order made no custody determination as to the Children because it stated "[f]or the above reasons, the court concludes that the plaintiff's claim to determine the place of residence of the minor children with their mother shall be rejected" (quoting Respondent's Complete Response Bundle (in Opposition to the Petition for Return of the Minor Children), Exhibit M at 160, Dkt. 19)).

### iii.    Petitioner's Purported Arrests

As to the Court's consideration of Petitioner's arrest in Canada, there was no allegation that Petitioner's arrest arose out of any mistreatment of the Children.  First Mot. Mem. at 4, Dkt. 35-2; Second Mot. at 2, Dkt. 36.  In fact, it appeared to be tied to the domestic dispute occurring between

Respondent and Petitioner in December 2023, and Respondent dropped the charges.  The Court is unaware of the "May 2024 protective order violation" that Respondent now alleges, as no such record is part of the docket in this case.  *See* Second Mot. at 2, Dkt. 36.  To the extent that Respondent intended to instead reference records she submitted suggesting Petitioner's arrest on May 12, 2025, in New York, there is no evidence that this arrest was associated with any abuse targeting the Children.  Thus, there is no clear and convincing evidence that the Children would be placed at grave risk of harm or otherwise in an intolerable situation if returned to Canada. *See* Hague Convention art. 13(b).  Therefore, the Court did not err in its analysis.

### iv.    Petitioner's Job History and Residence upon Return to Canada

Respondent also argues that the Court misstated Petitioner's job history and living arrangements upon his return to Canada.  First Mot. Mem. at 4, Dkt. 35-2.  The Court's determination of witness credibility is subject to review for clear error.  *See* FED. R. CIV. P. 52(a). The Court based its findings of fact on the record.  It weighed Petitioner's evidence that he returned to the family's shared residence and his job after leaving New York against Respondent's contention, based on unsubstantiated emails, that the apartment the family had been living in was given to a different family in their absence and that Petitioner had not returned to his job.  *See* October 31 Order at 9-10.  The Court remains persuaded by Petitioner's testimony.

### c.    The Court Appropriately Conducted Its Well-Settled Affirmative Defense Analysis.

Respondent argues that the Court miscalculated the wrongful-retention timing, First Mot. Mem. at 1, Dkt. 35-2, and that the Court inappropriately identified August 9, 2024, as the wrongful retention date in its well-settled defense analysis, *id.* at 3.  Respondent does not clarify how the Court mis-identified the date of wrongful retention but reasons that certain "legal constraints made departure from New York at the time of wrongful retention unlawful or impracticable," including

18

"ACS investigation hold periods," passport processing and inability to lawfully reenter Canada, and the Protective Order.  First Mot. Mem. at 3, Dkt. 35-2.  Respondent argues that the Court should have reached the issue of her "documented provision of stability in New York."  *See id.* at 3.

The facts Respondent raises are not relevant to the Court's analysis of when the wrongful retention occurred.  *See* Pérez-Vera Report ¶ 108 (The decisive date in wrongful retention cases is "that on which the child ought to have been returned to [his or her] custodians or on which the holder of the right of custody refused to agree to an extension of the child's stay in a place other than that of its habitual residence.").  It is unclear what Respondent means by referencing "ACS investigation hold periods" or her basis for asserting that an ongoing investigation by ACS prohibits the Children's return to Canada.  At the time of the wrongful retention on August 9, 2024, the Children's CUAET visas had not expired, and Petitioner sought their passports to return to Canada, which Respondent refused him access to.  These facts demonstrate that the Children had the ability to reenter Canada at the time of wrongful retention.  Additionally, Respondent did not obtain the Protective Order until August 21, 2024, which was after the date of wrongful retention.

Further, the facts Respondent raises are consistent with the Court's finding that August 9, 2024, was the operative date.  On August 9, 2024,[6] Petitioner reported to the RCMP that Respondent was refusing to give him their passports, threatening to take the Children, and forcing him to stay in the United States illegally.  It was clear to Petitioner on that day that if he returned to Canada, he would not be returning to Canada with the Children.  *See* October 31 Order at 28-

---

[6] Petitioner states that "on or about August 4, 2024," he sought assistance from the local police in New York that Respondent was attempting to compel him to remain in the United States.  Petitioner's Response to Respondent's Appeal at 1, Dkt. 39.  The Court maintains that August 9, 2024, was the date of wrongful retention, when Petitioner raised the same concerns with the RCMP in addition to his concerns about his custody rights as to the Children, that is, that Respondent's apparent refusal to permit the Children to return to Canada.  *See* October 31 Order at n.6, 30-31.

31.  Thus, Petitioner refused to agree to an extension of the Children's stay.  Because the Petition was filed on August 7, 2025, within one year of the wrongful retention on August 9, 2024, the Court had no reason to reach the issue of the Children's purported "documented provision of stability in New York."

### d.  The Court Did Not "Misapprehend Current Law-Governed Constraints" in Its Affirmative Defense Analyses.

Respondent states that the Court did not consider "federal protections under the Violence Against Women Act [("VAWA")], asylum proceedings, and ICARA Article 20, which prohibits return when fundamental human rights are at risk."  First Mot. Mem. at 1, Dkt. 35.  Respondent also contends that the Court mischaracterized immigration and legal status constraints that were pivotal to its Hague Convention Article 13(b) and Article 20 analysis.  First Mot. Mem. at 1, 4, Dkt. 35-2.  She states that the Court inappropriately reasoned that

> Petitioner 'can' provide healthcare 'in Canada,' but did not reconcile that [M.A.] is a U.S. citizen enrolled and thriving in religious school here; [Y.A. and M.A.] lack valid Canadian visas; CUAET is over; no identified lawful entry for them; [A.A.], age 2, applied for asylum with his family and is subject to federal protection . . . and immediate return would cut off ongoing medical coverage and schooling the Court recognized as settled.

*Id.* at 4.  Respondent also re-alleges her concern that there are "no Islamic full-time schools . . . available in their prior region" and adds that Canadian schools charge fees for children under five.  Second Mot. to Stay at 3, Dkt. 36.

The Court found that Respondent did not meet her burden of showing that the Children were well settled in New York for more than one year before Petitioner commenced the proceedings.  *See* October 31 Order at 28-31.  The Court also addressed the Children's healthcare and schooling when addressing Respondent's affirmative defenses of grave risk, *id.* at 27-28, and violation of human rights and fundamental freedoms, *id.* at 32-33.  The Court concluded Respondent did not establish by clear and convincing evidence that the Children would be exposed

to a grave risk of harm or that the return of the Children would be incompatible with the United States' laws and due process. *Id.* at 28, 33. The Court reasoned that Petitioner had the ability to provide the Children with healthcare and the Children would have access to the same schooling that they were enrolled in previously. *Id.* at 27-28, 32-33. Indeed, Petitioner points out that "[d]uring their entire time in Canada, the children were enrolled in school and fully integrated in the community, [and] benefitted from public health coverage as well as additional insurance through [his] employment." Petitioner's Response to Respondent's Appeal at 1-2, Dkt. 39. Petitioner also adds that Canadian education is free. *Id.* at 2.

In addition, the Court previously found that the Children's religious education was not impeded by their schooling in Canada to the extent of harm considered under Article 13(b) and Article 20. *See* October 31 Order at 27-28, 32-33. Moreover, Respondent's concerns do not establish either a grave risk of harm to the Children or that their return would not be permitted by the fundamental principles of the United States relating to the protection of human rights and fundamental freedoms. *See, e.g., Blondin v. DuBois (Blondin IV),* 238 F.3d 153, 162 (2d Cir. 2001) (finding that "situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences" "do not constitute a grave risk of harm under Article 13(b).")).

The Court also addressed Respondent's claim that Y.A. and M.A., who were not born in Canada, would lack legal status. It accorded little weight to their legal statuses and pending asylum claims given that, under applicable Hague Convention case law, domicile, nationality, residency, and pending asylum applications are not appropriate factors for the Court's determination of habitual residence or consideration of a respondent's affirmative defenses. *See* October 31 Order at 28 & n.12.

21

Similarly, Respondent's claim of federal protections under the Violence Against Women Act is misplaced.  Again, the Court emphasizes that the Hague Convention seeks to prevent Children from facing a grave risk of harm and Respondent's allegations of domestic violence of Respondent did not show that Petitioner posed a grave risk to the Children by virtue of any alleged harm of or efforts to control Respondent.  *See* October 31 Order at 24-25 (citing *Souratgar v. Lee*, 720 F.3d 96, 103-04 (2d Cir. 2013)).

Respondent also avers that "Petitioner's legal status in Canada is temporary and unstable," which makes return to Canada "unsafe and legally uncertain" for the Children.  Second Mot. at 3, Dkt. 36.  She provides no evidence to support this contention, and it is controverted by Petitioner's claim that he has applied for permanent residence as a pathway to citizenship for the entire family. October 31 Order at 13.

The Court maintains that a finding in favor of the grave risk defense, Article 13(b), or violations of human rights and fundamental freedoms defense, Article 20, require substantially higher evidentiary burdens than what Respondent has established.

With regards to analysis of the affirmative defenses asserted in this matter, the Court reiterates that even if Respondent had established any affirmative defense, the Court retains the discretion to order the Children's return and is not bound to permit the Children to remain in the United States.  *See* October 31 Order at 23-24 (citing *Souratgar*, 720 F.3d at 103 (citing *Blondin v. DuBois (Blondin II)*, 189 F.3d 240, 245 (2d Cir. 1999)); *see also* Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986) (acknowledging that the legislative history of the Hague Convention intended for the exceptions to be narrowly interpreted and used only in meritorious cases, when the respondent meets their

22

burden of proof and noting that "a finding that one or more of the exceptions provided by Articles 13 and 20 are applicable does not make refusal of a return order mandatory.").

In sum, Respondent has not demonstrated that the Court erred in its consideration of the evidence produced by Respondent or incorrectly analyzed Respondent's affirmative defenses, such that likelihood of success on appeal would be beyond more than a mere possibility.

### 2. Irreparable Harm to Respondent

Next, Respondent argues that returning the Children would cause irreversible harm by separating them from their mother, disrupting their schooling, terminating their healthcare, violating the family's ongoing asylum protection valid through 2030, and placing them in a country where they have no visa, housing, daycare, or guaranteed insurance. First Mot. at 2, Dkt. 35.

These allegations do not constitute irreparable harm. *See Tereshchenko v. Karimi,* 23-CV-2006 (DLC), 2024 WL 195547, at *4 (S.D.N.Y. Jan. 18, 2024) (finding the respondent would not suffer irreparable harm absent a stay because her claims that she and one of her children may not be able to return if they leave, the children live a stable life and receive medical care in the United States, and do not speak French did not constitute "irreparable harm."). Petitioner has stated that he has applied for a pathway to citizenship for the family and can obtain healthcare for the Children through his job. October 31 Order at 28. The record reflects that the Children's schooling in Canada was appropriate. *Id.* at 32. The Court also did not order that the Children be separated from Respondent or that the Children be permanently removed from the United States. Respondent has not demonstrated that she or the Children would be prohibited from leaving the United States or entering Canada, only that they were advised against doing so while Y.A. and A.A.'s Asylum and Withholding Application is pending. While the return to Canada may prove disruptive, it is not inherently and irreparably harmful. In addition, these circumstances are the

23

product of Respondent's wrongful retention of the Children, and it would be inconsistent with Hague Convention to allow Respondent to rely on them to delay her compliance with the Court's October 31 Order.

Without expressly doing so, Respondent attempts to raise the "age and maturity defense" by alleging the Children object to leaving the United States.  Second Mot. at 3, Dkt. 36.  "The application of this exception is not mandatory" especially where there is "the potential for brainwashing of the child by the alleged abductor" and "[a] child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child."  Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986).  The Court already held that there was no basis for this defense. *See* October 31 Order at n.10.  As Petitioner points out, the Children are between the ages of seven and two; they are unable to fully comprehend the legal and long-term implications of this matter and are subject to potential undue influence by Respondent. *See* Petitioner's Response to Respondent's Appeal at 2, Dkt. 39.  Consequently, the Court maintains that their age and immaturity weighs against considering their alleged objections.

Accordingly, there is no basis that Respondent would experience irreparable harm of enforcement of the October 31 Order absent a stay.

### 3.  Public Interest

Respondent contends that the United States has a compelling interest in upholding domestic violence protections, safeguarding children under federal asylum law, and ensuring accuracy and fairness in international child abduction determination.  First Mot. at 2, Dkt. 35.

Yet, the public interest weighs strongly against a stay.  The Hague Convention generally requires the prompt return of a child. *See Golan v. Saada,* 596 U.S. 666, 670 (2022) (citing Hague

Convention art. 1(a)).  This requirement "'ensures that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'"  *Id.* (quoting Hague Convention art. 1(b)).  The Court's role under the Hague Convention is not to determine custody, Hague Convention art. 16, nor determine whether repatriation would place the respondent parent's safety at grave risk, *Souratgar,* 720 F.3d at 104.  Respondent also argues that the public interest favors respect for the Protective Order.  First Mot. at 2, Dkt. 35.  But the October 31 Order did not flout the Protective Order; it merely ruled that the Children should return to Canada.  *See, e.g.* October 31 Order at 34-35.  Thus, the October 31 Order is not at odds with the public interest in upholding domestic violence protections and safeguarding children under federal asylum law as it pertains to domestic violence.

### 4.  Substantial Injury to Petitioner

Finally, Respondent argues that the harm to the Children if "removed" far outweighs any potential inconvenience to Petitioner during appellate review.  First Mot. at 2, Dkt. 35; First Mot. Mem. at 2, 5, Dkt. 35-2.  While she has filed an appeal, *see* Notice of Appeal as to Memorandum and Opinion, Dkt. 37, Respondent has not filed for an emergency appeal pursuant to the Second Circuit Rule 27.1(d).  Any stay of the Court's October 31 Order pending resolution of the appeal in accordance with the Second Circuit's typical timeframe for review would contravene the requirement that Hague Convention petitions be resolved with expediency.  Nevertheless, even if the Second Circuit construes Respondent's appeal liberally as an emergency appeal because she is *pro se,* a more immediate consideration of her appeal would continue to deprive Petitioner of his custody rights and prolong the Children's retention outside of their habitual residence.  Respondent

wrongfully retained the children over a year ago. Petitioner has already experienced substantial injury and will continue to experience it for as long as legal proceedings in this country last.

**5. Respondent's Request for Supervised Contact**

Lastly, in her motions to stay, Respondent repeatedly raises a request that the Children's contact with Petitioner be supervised by a neutral person and alternatively argues that the Court should have conditioned enforcement on supervised visitation. *See, e.g.*, First Mot. Mem. at 4, Dkt. 35-2; Second Mot. at 4, Dkt. 36. The issue should be addressed as part of a custody determination to be made by a Canadian court, and the Court declines to rule on it at this time.

## CONCLUSION

For the foregoing reasons, Respondent's First Motion to Stay, Dkt. 35, Second Motion to Stay, Dkt. 36, and Motion for Reconsideration at 6-18, Dkt. 40, are denied.

SO ORDERED.

/s/ _____
ORELIA E. MERCHANT
United States District Judge

November 10, 2025
Brooklyn, New York